668 A.2d 1076

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. FRANK FERTIG, A/K/A FRANK FERDIG,
DEFENDANT–RESPONDENT.

Argued September 26, 1995—Decided January 4, 1996.

*James F. Smith,* Assistant County Prosecutor, argued the cause for appellant (*Jeffrey S. Blitz,* Atlantic County Prosecutor, attorney).

*Matthew Astore,* Deputy Public Defender II, argued the cause for respondent (*Susan L. Reisner,* Public Defender, attorney; *Mr. Astore* and *Brad Wertheimer,* Assistant Deputy Public Defender, on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

The sole issue is whether the State may admit the hypnotically-induced testimony of an independent witness, Dennis Spier, at the trial of defendant, Frank Fertig, for felony murder. Finding that the hypnotist had refreshed improperly Spier's recollection in violation of *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981), the Law Division barred admission of the testimony. The Appellate Division denied the State's motion for leave to appeal. We granted the State's motion, 139 *N.J.* 437, 655 *A.*2d 440 (1995), and now affirm.

–I–

On December 12, 1969, during a robbery at Caesar's Restaurant on Route 40 in Hamilton Township, someone shot and killed the owner, Dominic Perri. Twenty-two years later, on June 13, 1991, the Atlantic County Prosecutor's Office indicted defendant. Crucial to the State's case is the admission of the testimony of Spier, who allegedly drove Fertig to the restaurant on the night of the murder.

According to the robbery victims, who were restaurant patrons and employees, the robber, a white male wearing dark clothes and a ski mask, fled into nearby woods. Approximately two-and-one-half hours after the shooting, the Absecon police stopped a car traveling east on Route 30, about twelve miles from Caesar's. The driver was Ralph Heath. Defendant was the sole passenger. Four days later, a hunter discovered a revolver, apparently the murder weapon, in the area where the police stopped the vehicle.

In March 1991, Egg Harbor police arrested Heath on narcotics charges. In exchange for dismissal of those charges and the return of over $10,000, which the police had seized, Heath gave a statement implicating defendant.

According to Heath, on the night of the murder, defendant had called and said that his car had broken down. Heath had picked up defendant on Route 40. On the way to Heath's home, the police had stopped them. In his statement, Heath denied that anyone had thrown the murder weapon from his car. When Heath arrived home, however, defendant admitted that he had robbed Caesar's and killed Perri. Heath also stated that Spier had driven defendant to the restaurant.

The prosecutor's investigators first interviewed Spier on March 20, 1991. In exchange for "conditional immunity," Spier related that he had driven a man to Caesar's. He did not recall the man's name, but described him as thin and approximately five-feet-eight-inches tall, a description that was consistent with defendant's appearance in 1969. According to Spier, the man wore a ski mask and gloves and carried a burlap bag. Spier also remembered that the man had carried "an automatic or a six-shot ... I don't remember what the gun looked like." He had been aware that the man had intended to rob the restaurant and had arranged to pick up the man after the robbery. The man, however, did not appear. Spier has never again seen him.

When the police showed Spier a photographic array that included defendant's picture, Spier could not identify defendant. At a subsequent interview, on March 25, 1991, Spier told the police that

the man he had driven was named Fred or Frank. After reviewing his records, Spier stated that he had driven the man in a blue Plymouth or Dodge. Spier recalled that he and Heath had "mutual interests in the commission of crimes."

On April 17, 1991, the police again interviewed Spier. Spier stated that he was certain that he had driven in his car the man named "Fred" or "Frank" to the scene of the robbery. He was certain also that the man carried a bag, had a revolver, and wore a dark-colored ski mask. According to Spier, Heath had arranged the robbery and the man was a friend of Heath's. Spier recalled that Heath had called the day after the robbery to say that a man had been killed and that Spier should forget about the event. Spier also remembered that Heath may have picked up the man after the robbery.

Before June 1, 1992, the date set for the trial, Heath died. On May 29, 1992, an investigator from the Atlantic County Prosecutor's Office met with Spier for pre-trial preparation. At that meeting, Spier told the investigator that on April 11, 1991, he had undergone hypnosis by a psychologist, Dr. Charles Babcock. The interviewing investigator stated that Spier was not sure "what he could remember or what was possibly brought out from him being hypnotized." Spier also told the investigator that his attorney, who had accompanied him to the session with Dr. Babcock, had advised him not to tell the police about the session.

On learning that Spier had been hypnotized, the prosecutor immediately informed the trial court. The court adjourned the trial to conduct a hearing to determine the admissibility of Spier's hypnotically-refreshed recollection.

–II–

The abiding concern with hypnotically-refreshed testimony is its reliability. In *Hurd, supra,* 86 *N.J.* 525, 432 *A.2d* 86, we noted several inherent problems with such testimony. First, a person undergoing hypnosis is "extremely vulnerable to suggestions," and will "tend to shape his 'recall' in response to intentional or

inadvertent cues from the questioner." *Id.* at 539, 432 *A.*2d 86. Second, a hypnotized person loses critical judgment, and "is more willing to speculate and will respond to questions with a confidence he would not have as a waking person." *Ibid.* Finally, and most troubling, after hypnosis, a person has "the tendency to confound memories evoked under hypnosis with prior recall." *Id.* at 540, 432 *A.*2d 86. Because hypnotic recall is indiscriminately mixed with waking memory, a post-hypnotic witness "will have strong subjective confidence in the validity of his new recall, which will make it difficult for an expert or a jury to judge the credibility of his memory." *Ibid.*

Despite the problems with hypnotically-refreshed testimony, we concluded in *Hurd* that "a rule of *per se* inadmissibility [would be] unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." *Id.* at 541, 432 *A.*2d 86. Relying on the testimony of Dr. Martin Orne, we adopted a set of procedural safeguards. *Id.* at 545, 432 *A.*2d 86. In adopting those safeguards, we noted that the reliability of hypnosis in reviving memory varies with the nature of the memory loss. *Id.* at 544, 432 *A.*2d 86. Consequently, we directed trial courts to consider first whether hypnosis is appropriate for the type of memory loss encountered in a given case. *Ibid.* Hypnotically-refreshed testimony is more reliable when the cause of the witness's memory loss is trauma rather than the passage of time. *Ibid.*

■■■■■ At a *Hurd* hearing, the court must determine whether the hypnosis complies with certain requirements:

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. . . .

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. . . .

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. . . .

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview.

[*Id.* at 545–46, 432 A.2d 86 (footnote omitted).]

*Hurd* also requires that "the party seeking to introduce the hypnotically refreshed testimony has the burden of establishing admissibility by clear and convincing evidence." *Id.* at 546, 432 A.2d 86. We concluded that the allocation of such a burden was "justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice." *Id.* at 547, 432 A.2d 86.

Here, the trial court conducted a hearing pursuant to the *Hurd* requirements. The court found that before the hypnosis, Spier's attorney had instructed Dr. Babcock that the purpose of the session was to help Spier remember more details about Fertig and the robbery.

Early in the session, Spier told Dr. Babcock that he had used hypnosis tapes to put himself to sleep and to stop smoking. Dr. Babcock told Spier that the "human mind never forgets" and that hypnosis is a sleep-like state. The court also found that Spier wanted the hypnotic session to help him to remember.

Concerning the conduct of the session, the court found:

Dr. Babcock elicited tentatively phrased recollections and then restated them to Spier as if they were fact. For example, Spier said he "thinks" he picked up defendant at Heath's house but is not sure. Later, Dr. Babcock questions Spier about picking up the defendant at Heath's house as if it were a firm recollection.

Finally, the court observed that despite Spier's protestations that he thought he had not fallen asleep, Spier had experienced unusu-

al numbness throughout his body, including his hands, a sensation consistent with hypnosis.

On September 7, 1993, at the request of the State, Dr. Herbert Spiegel, a psychiatrist, conducted a videotaped interview of Spier to determine whether Dr. Babcock had hypnotized him. Dr. Spiegel has developed a test, the Hypnotic Induction Profile (HIP) test, which is designed to determine a person's susceptibility to hypnosis. According to Dr. Spiegel, a HIP score of six on a scale of zero to sixteen indicates that a person is hypnotizable.

At the beginning of the session, Spier stated that he did not want to meet with Dr. Spiegel, but feared losing his immunity from prosecution. The session, which consisted primarily of short-answer questions posed by Dr. Spiegel, lasted twenty-three minutes. From the session, Dr. Spiegel assigned a score of 5.5 to Spier. Based on that score, Dr. Spiegel concluded that Spier was not hypnotizable and that Dr. Babcock had not hypnotized him.

Defendant's expert, Dr. William London, a psychologist, criticized the HIP test. According to Dr. London, the HIP test is not as widely accepted or reliable as the Stanford or Harvard hypnotizability tests. Further, Dr. London testified that the HIP test does not indicate reliably whether Spier could be hypnotized, especially considering that Spier had participated willingly with Dr. Babcock, but not with Dr. Spiegel.

Contrary to Dr. Spiegel, Dr. London believed that Dr. Babcock had hypnotized Spier. Dr. London qualified his belief by stating that no one unless present at the session could determine with certainty whether Dr. Babcock had successfully hypnotized Spier.

Both Dr. Spiegel and Dr. London took a dim view of Dr. Babcock's conduct of the hypnotic session. Dr. Spiegel characterized Dr. Babcock's lengthy hypnotic procedure as ineffective and outmoded. Both experts agreed that Dr. Babcock had erred by telling Spier that the "human mind never forgets" and that hypnosis is a sleep-like state.

■ Confronted with conflicting expert opinions, the trial court concluded that Dr. Babcock had hypnotized Spier. In reaching that conclusion, the court relied on several facts: Spier's belief that he had been hypnotized; his prior use of hypnosis tapes to induce sleep and to stop smoking; and his complaint of unusual numbness, particularly in his hands, at the end of the session. The court found further that Dr. Babcock's questioning, which the court found "highly suggestive," had influenced Spier's recollection.

Consistent with the *Hurd* guidelines, the court first considered the nature of Spier's memory loss. According to the court, the loss was attributable to the passage of time. Consequently, a "threshold doubt" existed "as to the validity and usefulness of hypnosis in this case." The court then found that the session with Dr. Babcock violated the *Hurd* guidelines:

> Dr. Babcock is only questionably independent ... as he was told to help Spier remember as much detail as possible.... The process was explicitly directed. Dr. Babcock was given a specific mandate and his highly suggestive and structured questioning complied with that mandate. Spier told Dr. Babcock that he felt guilty about his involvement because it resulted in the death of another, and by implication, that he would feel better if his testimony would result in a conviction. Dr. Babcock's unintentional addition of detail to Spier's memory tainted the hypnotically refreshed memory.

Finally, the Court found that even if Spier had not been hypnotized, "Dr. Babcock's session with Spier, according to Dr. London, has a high risk of having permanently shaped his recollection." The court concluded that Spier's post-hypnotic testimony was inadmissible.

Substantial and credible evidence in the record supports the trial court's factual findings. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974); *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964). Consequently, we accept them.

–III–

Initially the State contends that defendant, as the party urging the exclusion of the hypnotically-refreshed testimony, should bear

the burden of proving that Spier had been hypnotized. The argument leads nowhere. The trial court, as a matter of fact, has found that Spier had been hypnotized. Allocating the burden of proof to defendant would not change that result.

■ Under *Hurd,* moreover, the proponent of hypnotically-refreshed testimony bears the burden of proving its reliability. The *Hurd* guidelines apply, even to hypnotic sessions that fail. Allowing the proponent of post-hypnotic testimony to sidestep *Hurd* by contending that the session failed invites abuse. The burden of proving that the hypnotic session was unsuccessful must fall on the proponent of the testimony emanating from that session. Furthermore, the *Hurd* guidelines apply even if the State played no role in Spier's hypnosis. As the proponent of that testimony, the State bears the burden of proving both that Dr. Babcock's attempts to hypnotize Spier were unsuccessful and that the testimony satisfies the *Hurd* guidelines.

–IV–

In this Court, defendant requests that we reconsider *Hurd* and adopt a rule of *per se* inadmissibility of hypnotically-refreshed testimony. Alternatively, defendant requests that we require courts to instruct the jury about the problems with such testimony. Defendant did not raise those issues in the Law Division or the Appellate Division. Absent a more complete record, we decline to address them. We would be remiss, however, if we failed to note several significant developments since we decided *Hurd.*

In *Hurd,* we observed that "a majority of courts that have considered the question have held that hypnotically induced testimony is admissible." 86 *N.J.* at 535, 432 *A.*2d 86. Since our decision in *Hurd,* the tide has run the other way. Twenty-six courts now conclude that hypnotically-refreshed testimony is *per*

*se* inadmissible.  *See* Thomas M. Fleming, Annotation, *Admissibility of Hypnotically Refreshed or Enhanced Testimony,* 77 *A.L.R.* 4th 927, 943–47 (1990) (collecting cases); Michael J. Beaudine, *Growing Disenchantment with Hypnotic Means of Refreshing Witness Recall,* 41 *Vand.L.Rev.* 379, 400 (1988) (stating *per se* inadmissibility is majority rule).  Dr. Orne, on whose recommendations we relied in *Hurd, supra,* 86 *N.J.* at 545–46, 432 *A.*2d 86, now believes that procedural safeguards cannot fully protect against admission of testimony in which the witness confuses hypnotic pseudomemory with waking recall.  Martin T. Orne, *et al., Hypnotically Induced Testimony in Eyewitness Testimony: Psychological Perspective* 171, 205 (Gary L. Wells & Elizabeth F. Loftus, eds. 1984).  He concludes: "As has been pointed out, hypnosis should not be used to prepare a witness to testify in court, such as in an attempt to improve the recall of a previously unreliable or uncertain witness." *Id.* at 205.

Today, only four states consider such testimony to be generally admissible.  *State v. Brown,* 337 *N.W.*2d 138, 151 (N.D.1983); *State v. Jorgensen,* 8 *Or.App.* 1, 492 *P.*2d 312, 315 (1971); *State v. Glebock,* 616 *S.W.*2d 897, 903–04 (Tenn.Crim.App.1981); *Prime v. State,* 767 *P.*2d 149, 153 (Wyo.1989).  Although mindful of the problems posed by hypnotically-refreshed testimony, we decline to abandon *Hurd* in the absence of a more complete record.

Many federal courts evaluate post-hypnotic testimony under a form of the totality-of-the-circumstances test.  *Bundy v. Dugger,* 850 *F.*2d 1402, 1415 (11th Cir.1988), *cert. denied,* 488 *U.S.* 1034, 109 *S.Ct.* 849, 102 *L.Ed.*2d 980 (1989); *McQueen v. Garrison,* 814 *F.*2d 951, 958 (4th Cir.), *cert. denied,* 484 *U.S.* 944, 108 *S.Ct.* 332, 98 *L.Ed.*2d 359 (1987); *United States v. Kimberlin,* 805 *F.*2d 210, 219 (7th Cir.), *cert. denied,* 483 *U.S.* 1023, 107 *S.Ct.* 3270, 97 *L.Ed.*2d 768 (1986); *Sprynczynatyk v. General Motors Corp.,* 771 *F.*2d 1112, 1122–23 (8th Cir.1985), *cert. denied,* 475 *U.S.* 1046, 106 *S.Ct.* 1263, 89 *L.Ed.*2d 572 (1986); *United States v. Valdez,* 722

*F.*2d 1196, 1203 (5th Cir.1984). Several state courts have expressly adopted such a test. *State v. Iwakiri,* 106 *Idaho* 618, 682 *P.*2d 571 (1984); *State v. Johnston,* 39 *Ohio St.*3d 48, 529 *N.E.*2d 898, 906 (1988); *Walters v. State,* 680 *S.W.*2d 60, 63 (Tex.Ct.App.1984). Under this test, courts have considered a variety of factors, including procedural safeguards, presence of suggestive statements, nature of memory loss, importance of the testimony to the case, corroboration of the testimony with independent evidence, and others.· *See* Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6011 (1990 & Supp.1995) (endorsing but noting problems with totality-of-the-circumstances test). These courts recognize, as we did in *Hurd,* that a *per se* inadmissible rule may exclude otherwise reliable evidence. *See Valdez, supra,* 722 *F.*2d at 1203 (rejecting rule of *per se* inadmissibility).

Furthermore, a significant number of courts use procedural safeguards similar to those in *Hurd* to determine case-by-case whether hypnotically-refreshed testimony is admissible. *Chamblee v. State,* 527 *So.*2d 173, 175–76 (Ala.Crim.App.1988); *People v. Romero,* 745 *P.*2d 1003, 1016–17 (Colo.1987), *cert. denied,* 485 *U.S.* 990, 108 *S.Ct.* 1296, 99 *L.Ed.*2d 506 (1988); *Brown v. State,* 426 *So.*2d 76, 93–94 (Fla.Dist.Ct.App.1983); *House v. State,* 445 *So.*2d 815, 826–27 (Miss.1984); *State v. Beachum,* 97 *N.M.* 682, 689–91, 643 *P.*2d 246, 253–55 (App.1981); *State v. Adams,* 418 *N.W.*2d 618, 624 (S.D.1988); *State v. Armstrong,* 110 *Wis.*2d 555, 329 *N.W.*2d 386, 394–95, *cert. denied,* 461 *U.S.* 946, 103 *S.Ct.* 2125, 77 *L.Ed.*2d 1304 (1983).

■ Still other courts have held that, because the scientific community does not generally accept hypnotically-refreshed testimony, such testimony is inadmissible under *Frye v. United States,* 293 *F.* 1013 (D.C.Cir.1923). *See, e.g., Contreras v. State,* 718 *P.*2d 129, 135–36 (Alaska 1986); *People v. Zayas,* 131 *Ill.*2d 284, 137 *Ill.Dec.* 568, 572–73, 546 *N.E.*2d 513, 517–18 (1989). The foregoing

changes in the status of hypnotically-refreshed testimony in other jurisdictions, combined with the absence of an adequate record, lead us to decline defendant's belated invitation to reject the *Hurd* guidelines.

Finally, as we noted in *Hurd*, people who have been hypnotized are vulnerable to intentional or inadvertent suggestions made by the interviewers, lose critical judgment while under hypnosis, tend to confound hypnotic recall with waking memory, and have increased confidence in their testimony after hypnosis. 86 *N.J.* at 539–40, 432 *A.*2d 86. Accordingly, when trial courts admit hypnotically-refreshed testimony, they should instruct the jury of the effect that hypnosis may have on that testimony. Towards that end, we request our Committee on Model Criminal Jury Instructions to develop an appropriate charge.

The judgment of the Law Division is affirmed, and the matter is remanded to that court for further proceedings.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.