294 N.J. Super. 267 (1996)
683 A.2d 221
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MOREY MARCUS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1995.
Decided October 17, 1996.
*270 Before Judges SKILLMAN, P.G. LEVY and EICHEN.
Charles J. Mysak argued the cause for appellant.
Linda A. Rinaldi, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Rinaldi of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
The primary issue presented by this appeal is whether the results of DNA tests are admissible in a criminal trial.
*271 After a thirty-two day trial, a jury found defendant guilty of purposeful or knowing murder, in violation of N.J.S.A. 2C:11-3a(1)(2), felony murder, in violation of N.J.S.A. 2C:11-3a(3), and attempted aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(3) and (4). The court sentenced defendant to life imprisonment, with thirty years of parole ineligibility, for purposeful or knowing murder, and a concurrent thirty year term of imprisonment for felony murder. The court also imposed a consecutive ten year term of imprisonment for attempted aggravated sexual assault.
The crimes were committed in Rutherford during the early morning hours of December 28, 1989, after defendant and the victim had been seen drinking together in several local bars. Defendant and the victim were seen leaving the last of these bars around 3 a.m. Approximately an hour later, the victim staggered into an all-night gasoline station, completely naked and covered with blood. After asking the persons in the station and the police who arrived shortly thereafter for help, the victim fell unconscious and later died in the hospital. An autopsy revealed that the cause of her death was multiple stab wounds to the neck, chest and legs.
Within a few minutes after the victim walked into the gasoline station, a police officer responding to the scene observed defendant's van parked nearby with its lights on and its side passenger door open. When the officer paused to ask defendant what he was doing, defendant said he was on his way to work but had stopped to urinate. After writing down the van's license plate number, the officer proceeded to the gasoline station. A tow truck operator at the gasoline station later informed the officer that he had seen a van, with its side passenger door open, go through a stop sign at an intersection near the gasoline station around the same time that the victim arrived there mortally wounded. The police later found a dress, purse, sweater, coat and jewelry belonging to the victim in the same vicinity where defendant's van had been parked, and at trial defendant admitted discarding these items at that location.
*272 The police investigation of the crime scene revealed a trail of the victim's bloody footprints in snow that had fallen earlier that evening, which ran a distance of three or four blocks to a point of origin. At this location, the police observed a large pool of blood, boot prints which roughly matched the size of boots later seized from defendant, and tire tracks.
Approximately a half hour after the local police officer's observation of defendant near the murder scene, defendant was apprehended for drunk driving by two New Jersey State troopers. The troopers made a cursory inspection of the interior of the van and noticed a hunting knife and female high heel shoes. One of the troopers also noticed dried blood on defendant's knuckles and forehead as well as the top of his right boot. At trial, defendant acknowledged that he threw the victim's high heel shoes into a vacant lot after retrieving his van from the State Police.
The police were unable to find the knife used to inflict the stab wounds upon the victim. However, the police found an empty knife sheath inside defendant's van that could have been used to carry the type of knife that caused the wounds. The police also found blood stains all over the inside of the van. Serology tests definitively determined that the bloodstains could not have come from defendant but that the victim could have been the source.
Defendant was arrested less than twenty-four hours after the crime and questioned by the police. Defendant initially claimed that he had left the victim in the parking lot of a bar at approximately 3 a.m. and then drove away. However, after the police confronted defendant with the fact that an officer had seen him near the scene of the crime shortly after 4 a.m., defendant changed his story and asserted that he had driven the victim to a secluded spot after she agreed to have sex with him. According to defendant, the victim undressed and got into the back of his van, but suddenly began acting erratically, first yelling and screaming, and then attempting to stab him with a knife she apparently had taken out of her purse. Defendant asserted that after briefly struggling with him, the victim left the van and headed in the *273 direction of the gas station, naked but unharmed. Although defendant at first denied stabbing the victim, after further police interrogation he said that he could not remember stabbing her but that "it's possible."
At trial, the State also presented DNA evidence through experts who testified that the DNA print patterns of bloodstains found on a pair of defendant's blue jeans seized from his bedroom matched those of the victim and that defendant's blood could not possibly have been the source of these bloodstains. Defendant responded with experts who challenged the methodology of the State's DNA testing and the results it produced.
On appeal, defendant makes the following arguments:
I. THE DNA EVIDENCE AND TESTIMONY IN THIS CASE SHOULD NOT HAVE BEEN ADMITTED, BECAUSE NEITHER THE PROCEDURE USED BY LIFECODES, NOR THE RESULTS OBTAINED, PARTICULARLY AS TO MATCHES AND THE STATISTICAL INTERPRETATION OF SAME, HAVE BEEN GENERALLY ACCEPTED AS RELIABLE IN THE SCIENTIFIC COMMUNITY.
II. THE EXCLUSION BY THE TRIAL COURT OF STATEMENTS MADE BY THE VICTIM WHILE SHE WAS INVOLUNTARILY COMMITTED AT BERGEN PINES HOSPITAL THAT SHE "HAD THE NERVE TO KILL HERSELF", AND THAT SHE WISHED "TO DESTROY" HER BOYFRIEND'S CAR WITH A HAMMER, WAS PREJUDICIAL TO THE DEFENSE AND COMPROMISED THE DEFENDANT'S RIGHT TO A FAIR TRIAL IN THAT THE DEFENDANTS VERSION OF THE ALLEGED INCIDENT WOULD HAVE BEEN SUPPORTED BY SAID TESTIMONY.
III. IT WAS INAPPROPRIATE FOR THE TRIAL JUDGE TO RESPOND TO THE JURY'S QUESTION AS TO THE APPLICABILITY OF THE DEATH PENALTY IN THIS CASE, TO THE EFFECT THAT IT DID NOT APPLY, BECAUSE PUNISHMENT IS NOT WITHIN THE JURY'S PROVINCE, AND ANY INSTRUCTION CONCERNING SAME TENDS TO DIMINISH THE PRESUMPTION OF INNOCENCE.
IV. IT WAS HIGHLY PREJUDICIAL TO THE DEFENDANT'S RIGHT TO A FAIR TRIAL FOR THE TRIAL JUDGE TO PERMIT THE INTRODUCTION OF EVIDENCE BY THE STATE OF A COLLECTION OF KNIVES FOUND IN DEFENDANT'S HOME AND WHICH HAD, BY THE STATE'S OWN ADMISSION, NO EVIDENTIARY VALUE TO THIS CASE, NOR WAS IT RELEVANT OR PROBATIVE AS TO ANY WEAPON USED IN THE ALLEGED INCIDENT.

*274 V. DEFENDANT'S RIGHT UNDER THE UNITED STATES AND NEW JERSEY CONSTITUTIONS, TO A FAIR AND SPEEDY TRIAL, WAS VIOLATED BY THE MORE THAN THREE-YEAR DELAY IN BRINGING THE DEFENDANT TO TRIAL.
VI. ONCE THE JURY WAS SWORN, THE TRIAL JUDGE ABUSED HIS DISCRETION IN EXCUSING A JUROR FOR A FINANCIAL HARDSHIP, AND THUS, DEPRIVED THE DEFENDANT OF THE RIGHT TO A FAIR TRIAL.
VII. THE EXCLUSION OF THE VICTIM'S PAST HISTORY OF VIOLENT ACTS AND WORDS, BY THE TRIAL COURT, AS CONTAINED IN VARIOUS POLICE AND MEDICAL RECORDS, DEPRIVED THE DEFENDANT OF THE RIGHT TO A FAIR TRIAL ON ALL THE RELEVANT AND PROBATIVE EVIDENCE.
We conclude for the reasons set forth at length in section I of this opinion that DNA analysis is generally accepted within the scientific community and that the State established a proper foundation for the admission of its experts' DNA analysis of bloodstains relevant to this case. For the reasons set forth in sections II and III of this opinion, we also reject defendant's arguments that the trial court erred in responding to the jury's inquiry regarding the applicability of the death penalty to this case and that the State violated his constitutional right to a speedy trial. Defendant's other arguments are clearly without merit and do not require discussion. R. 2:11-3(e)(2). Accordingly, we affirm defendant's conviction and sentence.

I
"In New Jersey, the results of scientific tests are admissible at a criminal trial only when they are shown to have `sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of truth.'" Romano v. Kimmelman, 96 N.J. 66, 80, 474 A.2d 1 (1984) (quoting State v. Hurd, 86 N.J. 525, 536, 432 A.2d 86 (1981)). However, scientific acceptability need not be predicated upon universal agreement in the absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence. Ibid. The party offering such evidence is only required to show that the scientific technique has gained general acceptance *275 within the scientific community. Ibid.; see also State v. Spann, 130 N.J. 484, 509-10, 617 A.2d 247 (1993) (reaffirming New Jersey's continued use in most contexts of the "general acceptance by the relevant scientific community" test); but cf. State v. Fertig, 143 N.J. 115, 126-27, 668 A.2d 1076 (1996) (reaffirming the admissibility of hypnotically refreshed testimony under the "Hurd guidelines" even though courts in other jurisdictions have barred such testimony on the ground that the phenomenon of hypnotically refreshed memory is not generally accepted within the scientific community); compare Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591-94, 113 S.Ct. 2786, 2796-97, 125 L.Ed.2d 469, 482-83 (1993).
There are three ways a party offering the results of scientific evidence can show its general acceptance within the scientific community: "(1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony." Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 379, 522 A.2d 405 (1987). In addition to showing its general acceptance in the scientific community, a party offering scientific evidence must show that the technique, methodology or procedure was correctly used to produce that evidence. Romano v. Kimmelman, supra, 96 N.J. at 81, 474 A.2d 1; State v. Hurd, supra, 86 N.J. at 543, 432 A.2d 86.
Prior to trial, the State provided defendant with a report of its DNA expert, Lifecodes Corporation (Lifecodes), which concluded that the DNA print patterns of the bloodstains found on defendant's jeans matched the DNA print patterns of the bloodstains on the T-shirt used to cover the victim's body. This report also concluded that the frequency of occurrence of these DNA print patterns was approximately one in ten billion among the North American Black population and approximately one in 4.7 billion among the North American Caucasian population.
*276 The trial court conducted a twenty-eight day "Frye hearing"[1] with respect to the admissibility of this DNA evidence. At the conclusion of the hearing, the court issued an oral opinion which concluded that "Lifecodes substantially performed scientifically acceptable tests, thereby obtaining significantly reliable results within a reasonable degree of scientific certainty." Although the court noted that there was some controversy among experts in the field regarding the calculation of the statistical probability of matching DNA print patterns, it concluded that this controversy did not require the exclusion of the State's proffered DNA evidence. In conformity with this ruling, the State presented evidence at trial of the match between the DNA print patterns of the bloodstains found on defendant's jeans and on the T-shirt used to cover the victim and of the statistical probability of a person other than the victim being the source of the bloodstains on the jeans.
On appeal, defendant has presented arguments relating both to the general acceptance within the scientific community of DNA testing and to the accuracy of Lifecodes' testing of the bloodstains involved in this case. Before addressing each of these arguments, it is appropriate to describe briefly the scientific principles which underlie DNA analysis and the procedures involved in the method of DNA analysis used in this case.[2]
Every human cell with a nucleus contains a copy of the DNA of the individual to whom the cell belongs. DNA is a simple molecule in the shape of a curved double helix "ladder" composed of pairs of four nucleotides which pair off in each step of the DNA molecule ladder. There are approximately three billion such "base pairings" in the DNA of humans, which are carried on twenty-three pairs of chromosomes. About 99% of these base pairings are the same from person to person, accounting for such *277 shared human characteristics as two legs, a nose and ten digits on the hands and feet. However, there are some regions within human DNA that vary greatly among individuals (except for identical twins who have identical DNA), which are referred to as "polymorphic" and which provide the basis for DNA identification. Although the examination of every polymorphic site is not currently feasible, an examination of a small number of select sites can establish a DNA profile of a cell sample that can be compared to the DNA profile of another cell sample.
DNA analysis involves (1) creating DNA profiles of evidence samples; (2) determining whether profiles match; and (3) if samples match, determining the statistical significance of the match.
There are two methods in general use to create DNA profiles of evidence samples: the polymerase chain reaction (PCR) and restriction fragment length polymorphism (RFLP) methods.[3] In this case, the State's expert, Lifecodes, used the standard seven-step RFLP method used by most DNA labs. The first six steps in an RFLP analysis of a cell sample are: (1) extraction of the DNA molecule from the sample; (2) digestion of the DNA with an enzyme which cuts it into fragments at selected polymorphic sites; (3) electrophoresis, which is a process by which DNA fragments are separated from one another and set in an agarose gel; (4) Southern transfer or blotting, which is a process by which the DNA fragments are removed from the agarose gel and fixed on a nylon membrane in the same pattern as in the gel; (5) hybridization, which is the application of a numbered DNA probe to the nylon membrane, which binds with specific DNA sequences, thereby forming a measurable DNA fragment in a specific polymorphic region of the DNA; and (6) autoradiography, which is a process *278 that produces "autorads", or x-ray films, of the selected DNA fragments, which appear on the film as dark bands.[4] Lifecodes developed autorads of five probes of different polymorphic sites in the DNA of the bloodstain samples obtained from defendant's jeans and the T-shirt used to cover the victim.
The seventh step in the RFLP analysis involves the interpretation of the "autorads" developed in step six to determine whether the DNA print patterns of each of the probes match. At Lifecodes the interpretative stage of a DNA analysis begins with the testing scientist visually examining the bands on the autorads. If the scientist finds a visual match, that scientist and another Lifecodes scientist separately "size" the autorads by use of a computer screen which measures the bands in comparison with control markers for a particular polymorphic site. If the scientists' measurements of the bands in the two samples that are being compared are within 1.8% of each other for all of the probes, the samples are considered to be "matched."
Once a match is found, the final part of the interpretative stage is the calculation of the statistical significance of the match. At Lifecodes, any difference in the sizing done by the two scientists who have found the match is averaged. This average is taken as the size of the DNA fragment derived from a particular probe, which is then compared to the frequency with which that print pattern occurs in the relevant population. Lifecodes uses a database generated from DNA samples submitted for paternity analysis from sources throughout the country, segregating the results by race, to establish the population frequency of a particular DNA print pattern. This calculation is repeated with respect to the autorads developed from each of the five probes of the matched cell samples. The individual frequencies are then multiplied together, *279 using what is called the product rule, to compute an aggregate probability of a random match.
The premise underlying the use of the product rule to calculate population frequencies is that the DNA patterns developed from the separate probes occur independently of each other in the relevant population.[5] This is important because each probe may identify a sequence which is expected in one of a hundred or one of ten people, but if several different probes identify sequences which occur independently, the likelihood of their existing in combination becomes extremely remote.
Applying this analysis, Lifecodes determined that the mean frequency of occurrence in the Caucasian population of the matching DNA print patterns developed from the five probes made from the bloodstains found on defendant's jeans and the T-shirt used to cover the victim were, respectively, 1 in 1,205, 1 in 40, 1 in 8, 1 in 678, and 1 in 18. The combined frequency of occurrence of the DNA print patterns of all of these five probes, using the product rule, would be 1 in 4.7 billion.
The general acceptance within the scientific community of DNA analysis by use of the RFLP method is clearly shown by authoritative scientific literature, the overwhelming weight of judicial authority throughout the country and the testimony of the experts at the Frye hearing in this case. One leading scholarly commentary has noted that "[b]y the middle of [1994], there had been more than 400 scientific papers, 100 scientific conferences, 3 sets of guidelines from the Technical Working Group of DNA Analysis Methods ..., 150 court decisions and, importantly, a 3-year study by a National Research Council ... committee released in 1992," and concluded based on an analysis of these materials that it "could identify no remaining problem that should prevent the full use of DNA evidence in any court." Eric S. Lander & Bruce Bodowle, "DNA Fingerprinting Dispute Laid to Rest," 371 Nature *280 735 (Oct. 27, 1994). Recently, the Committee on DNA Technology in Forensic Science of the National Research Council[6] issued a report on the use of DNA analysis for forensic purposes which concludes that "DNA analysis is one of the greatest technical achievements for criminal investigation since the discovery of fingerprints," that "[m]ethods of DNA profiling are firmly grounded in molecular technology," and that "[w]hen [DNA] profiling is done with appropriate care, the results are highly reproducible." Committee on DNA Forensic Science, National Research Council, The Evaluation of Forensic DNA Evidence 2-14 (prepublication copy, 1996) (hereinafter "1996 NRC report").
The one general topic relating to DNA analysis that has been the subject of substantial debate within the scientific community has been the calculation of the statistical significance of matches of DNA profiles.[7] This debate is described as follows in the 1992 NRC report:

*281 [P]opulation frequencies often quoted for DNA typing analyses are based not on actual counting, but on theoretical models based on the principles of population genetics. Each matching allele[8] is assumed to provide statistically independent evidence, and the frequencies of the individual alleles are multiplied together to calculate a frequency of the complete DNA pattern. Although a databank might contain only 500 people, multiplying the frequencies of enough separate events might result in an estimated frequency of their [sic] all occurring in a given person of 1 in a billion. Of course, the scientific validity of the multiplication rule depends on whether the events (i.e., the matches at each allele) are actually statistically independent.
....
The validity of the multiplication rule depends on the assumption of absence of population substructure. Population substructure violates the assumption of statistical independence of alleles. In a population that contains groups each with different allele frequencies, the presence of one allele in a person's genotype can alter the statistical expectation of the other alleles in the genotype. For example, a person who has one allele that is common among Italians is more likely to be of Italian descent and is thus more likely to carry additional alleles that are common among Italians. The true genotype frequency is thus higher than would be predicted by applying the multiplication rule using the average frequency in the entire population.
....
The key question underlying the use of the multiplication rule  i.e., whether actual populations have significant substructure for the loci used for forensic typing  has provoked considerable debate among population geneticists. Some have expressed serious concern about the possibility of significant substructure. They maintain that census categories  such as North American Caucasians, blacks, Hispanics, Asians, and Native Americans  are not homogeneous groups, but rather that each group is an admixture of subgroups with somewhat different allele frequencies. Allele frequencies have not yet been homogenized, because people tend to mate within their subgroups.
These populations geneticists also point out that, for any particular genetic marker, the actual degree of subpopulation differentiation cannot be predicted in advance, but must be determined empirically. Furthermore, they doubt that the presence of substructure can be detected by the application of statistical tests to data from large mixed populations. Population differentiation must be assessed through direct studies of allele frequencies in ethnic groups.
Other population geneticists, while recognizing the possibility or likelihood of population substructure, conclude that the evidence to date suggests only a minimal effect on estimates of genotype frequencies. Recent empirical studies concerning *282 VNTR loci detected no deviation from independence within or across loci. Moreover, as pointed out earlier, pairwise comparisons of all five-locus DNA profiles in the FBI database showed no exact matches; the closest match was a single three-locus match among 7.6 million pairwise comparisons. Those studies are interpreted as indicating that multiplication of gene frequencies across loci does not lead to major inaccuracies in the calculation of genotype frequency  at least not for the specific polymorphic loci examined.
[1992 NRC report at 10-12.]
To reconcile the conflicting views regarding the multiplication rule, more commonly referred to as the product rule, the 1992 NRC report proposed that experts in the field use what is called the "ceiling principle," which assumes the existence of some degree of population substructure and generates more conservative population frequency statistics than the product rule.[9] However, the NRC has recently concluded that use of the ceiling principle overstates the effect of population substructure in calculating the population frequencies of a combination of matching DNA print patterns and consequently its use for forensic purposes is unnecessary. 1996 NRC report at 5-30 to 5-33. The Committee now recommends the use of a modified version of the product rule which assumes the existence of some undetected population substructure of a lesser magnitude than that reflected by use of the ceiling principle. Id. at 0-21. Most significantly, the 1996 NRC report reaffirms the conclusion of the 1992 NRC report that properly conducted DNA tests produce highly reliable results and that DNA analysis is generally accepted within the scientific community. Id. at 2-14.
Although there is no reported appellate decision in New Jersey dealing with the admissibility in a criminal trial of the results of DNA analysis conducted by means of the RFLP method, there is *283 overwhelming authority in other jurisdictions sustaining the admissibility of such evidence. See, e.g., United States v. Bonds, 12 F.3d 540 (6th Cir.1993); United States v. Jakobetz, 955 F.2d 786 (2d Cir.), cert. denied, 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); Harmon v. State, 908 P.2d 434, 438-42 (Alaska Ct. App. 1995); State v. Johnson, 186 Ariz. 329, 922 P.2d 294 (1996); People v. Wilds, 48 Cal. App.4th 1740, 37 Cal. Rptr.2d 351, review granted, ___ Cal.4th ___, 39 Cal. Rptr.2d 406, 890 P.2d 1115 (Cal. 1995); People v. Soto, 48 Cal. App.4th 924, 35 Cal. Rptr.2d 846 (1994), review granted, ___ Cal.4th ___, 39 Cal. Rptr.2d 406, 890 P.2d 1115 (1995); Lindsey v. People, 892 P.2d 281 (Colo. 1995); Fishback v. People, 851 P.2d 884 (Colo. 1993); State v. Sivri, 231 Conn. 115, 646 A.2d 169 (1994); People v. Miller, 173 Ill.2d 167, 219 Ill.Dec. 43, 670 N.E.2d 721 (1996); Armstead v. State, 342 Md. 38, 673 A.2d 221 (1996); Commonwealth v. Lanigan, 419 Mass. 15, 641 N.E.2d 1342, 1346-50 (1994); People v. Chandler, 211 Mich. App. 604, 536 N.W.2d 799, 801-03 (1995), appeal denied, ___ Mich. ___, 554 N.W.2d 12 (1996); State v. Weeks, 270 Mont. 63, 891 P.2d 477, 486-91 (1995); State v. Anderson, 118 N.M. 284, 881 P.2d 29 (1994); People v. Wesley, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994); State v. Pierce, 64 Ohio St.3d 490, 597 N.E.2d 107 (1992); State v. Morel, 676 A.2d 1347, 1350-56 (R.I. 1996); State v. Copeland, 130 Wash. 244, 922 P.2d 1304 (1996); State v. Peters, 192 Wis.2d 674, 534 N.W.2d 867, 872-73 (App.), review denied, 537 N.W.2d 572 (Wis. 1995). In fact, the only significant area of dispute regarding the admissibility of such evidence  reflecting the recent debate within the scientific community  has been whether experts should be allowed to express opinions as to the statistical significance of matches of DNA print patterns by applying the product rule or whether they should instead be required to use the ceiling principle. See State v. Bloom, 516 N.W.2d 159 (Minn. 1994) (recognizing that DNA testing is generally accepted in scientific community and that such evidence is thus admissible, but conditioning admissibility on testimony as to frequency of match between defendant's genetic profile and genetic profile of crime scene evidence being limited to use of *284 the "ceiling principle" calculation); State v. Vandebogart, 139 N.H. 145, 652 A.2d 671, 675-80 (1994) (same); State v. Streich, 658 A.2d 38, 43-50 (Vt. 1995) (same).
In United States v. Jakobetz, supra, the court noted that "the general theories of genetics which support DNA profiling are unanimously accepted within the scientific community" and concluded that "a court could properly take judicial notice of the general acceptability of the general theory." 955 F.2d at 799. The court also rejected a number of objections to the particular DNA analysis of the government's expert in that case, including a claim that the expert assumed without any scientific support that "there was no evidence of substructure or subgroups within the Caucasian population" in using the product rule to calculate the statistical probability of a person other than the defendant having the same DNA profile as found in the semen sample taken from the victim. Ibid.
In United States v. Bonds, supra, the court rejected the defendant's argument that scientific controversy regarding the statistical significance of matching DNA print patterns rendered DNA test results inadmissible, stating that:
In some instances, there may be several different theories or procedures used concerning one type of scientific evidence, all of which are generally accepted. None may have the backing of the majority of scientists, yet the theory or procedure can still be generally accepted. And even substantial criticism as to one theory or procedure will not be enough to find that the theory/procedure is not generally accepted. Only when a theory or procedure does not have the acceptance of most of the pertinent scientific community, and in fact a substantial part of the scientific community disfavors the principle or procedure, will it not be generally accepted.
[12 F.3d at 562.]
Consequently, the court held that any question as to the statistical significance of the match between the DNA profile of defendant's blood and the bloodstain found in the victim's car went to the weight rather than the admissibility of the government's DNA evidence:
Because the DNA results were based on scientifically valid principles and derived from scientifically valid procedures, it is not dispositive that there are scientists *285 who vigorously argue that the probability estimates are not accurate or reliable because of the possibility of ethnic substructure. The potential of ethnic substructure does not mean that the theory and procedures used by the FBI are not generally accepted; it means only that there is a dispute over whether the results are as accurate as they might be and what, if any, weight the jury should give those results.
[Id. at 564-65.]
Consistent with the scientific literature in the field and the decisions in other jurisdictions, the State presented compelling testimony by knowledgeable experts that DNA testing by the RFLP method is generally accepted and is sufficiently reliable to warrant its admission in criminal cases. Drs. Michael Baird and Martin Tracey, experts in the fields of both molecular biology and genetics, Dr. Henry Lee, a molecular biologist and biochemist, and Dr. Bernard Devlin, an expert in population genetics, all testified in considerable detail regarding the procedures used in this method of DNA testing as well as its general acceptance within the scientific community for providing reliable identifications of the sources of blood and other human cells. Defendant's experts did not dispute the general acceptance within the scientific community of the RFLP method of DNA testing. Rather, these experts' challenges to Lifecodes' test results were limited to Lifecodes' calculations of the frequency with which the matching DNA profiles occur in the population and the reliability of Lifecodes' analysis of the specific evidence samples involved in this case. Therefore, we consider each of these areas of conflicting expert testimony to determine whether the trial court properly admitted the DNA evidence of a match between the bloodstains found on defendant's jeans and on the T-shirt placed on the victim's body.
At the Frye hearing, the State's experts, using the product rule, calculated that the frequency of occurrence in the Caucasian population of the DNA profile of the bloodstains found on defendant's jeans and on the T-shirt is 1 in 4.7 billion. However, defendant's experts raised substantially the same questions about the product rule that had resulted in the recommendation of the 1992 NRC report that the "ceiling principle" be used to calculate *286 population frequency statistics for forensic purposes; that is, the alleged lack of validation of the product rule's assumption that each matching DNA print pattern provides statistically independent evidence. Applying the "ceiling principle," one of defendant's experts, Dr. William M. Shields, a zoologist and population geneticist, testified that, using Lifecodes' test results, the likelihood of a person's DNA profile matching the DNA sample derived from the jeans taken from defendant's bedroom would be one in 3.4 million rather than the one in 4.7 billion figure calculated by use of the product rule. Dr. Shields also testified that if the results of one of Lifecodes' probes were excluded from consideration as unreliable, as Dr. Shields contended should be done, the frequency of occurrence of the DNA profile of the bloodstains found on defendant's jeans, using the ceiling principle, would be one in 6,899. Another of defendant's experts, Dr. Seymour Geisser, a mathematician, testified that in the absence of better evidence of the statistical independence of the DNA print patterns developed from separate probes, it was inappropriate to combine the statistical probability of a random match of DNA print patterns even by use of the ceiling principle.[10] Disregarding the results of two probes which another of defendant's experts, Dr. Peter D'Eustachio, concluded were unreliable, Dr. Geisser's analysis would lead to the conclusion that the frequency of occurrence of the least common of the DNA print patterns produced by the remaining three probes, which was one in 678, would be the only reliable population frequency statistic to use in determining the statistical significance of the matching DNA print patterns derived from the bloodstains found on defendant's jeans and on the T-shirt.
Consequently, the issue is whether the trial court was compelled to exclude all evidence of the DNA test results simply because *287 experts in the field, including the experts who testified at the Frye hearing, disagree about the scientific reliability of the product rule in calculating the probability of a random match of DNA print patterns. Initially, we note, as previously discussed, that the NRC has recently reaffirmed the appropriateness of using a variation of the product rule in calculating the statistical significance of matching DNA profiles. Therefore, it is even clearer now than at the time of the Frye hearing that the use of the product rule in DNA analysis is generally accepted in the scientific community.
In any event, any continuing debate among experts in the field of population genetics regarding the calculation of population frequencies of matching DNA print patterns does not affect the general acceptance of DNA analysis within the scientific community and thus should not result in the exclusion of such evidence in criminal trials. There is an overwhelming consensus of opinion among experts in the field that properly conducted DNA tests using the RFLP method produce highly reliable results. Consequently, the introduction of these results into evidence at a criminal trial would clearly aid the jury in performing its fact-finding responsibilities. The mere existence of a genuine dispute as to whether the probability of a random match of DNA samples is 1 in 4.7 billion, 1 in 3.4 million, or even some lesser probability, should not prevent the trier of fact from hearing evidence which has a high degree of reliability. For scientific evidence to be admissible, we only require that the scientific technique or procedure be accepted as scientifically reliable, not that it produce results which are beyond all legitimate debate. In fact, it is commonplace in our courtrooms for juries to hear conflicting expert opinions regarding the precise significance of scientific tests. We conclude that it is appropriate to follow the same approach with respect to the jury's consideration of evidence of DNA testing, including the calculation of population frequencies.
Thus, if DNA tests using the RFLP method have been properly conducted, evidence of the results of those tests should *288 be admitted. The State also may present evidence of population frequencies calculated by use of the product rule, the ceiling principle or any other method that has a legitimate scientific basis. The defendant remains free to present conflicting expert opinion testimony regarding population frequency calculations. A point ultimately may be reached where there is such widespread agreement among experts in the field regarding the proper method of calculating population frequencies that only statistics generated by that methodology should be presented to the jury. However, until such a scientific consensus is established, this remains a legitimate subject for expert testimony at trial. See State v. Spann, supra, 130 N.J. at 519-20, 617 A.2d 247 (1993); see also State v. Harvey, 121 N.J. 407, 430-431, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991); State v. King, 215 N.J. Super. 504, 518-20, 522 A.2d 455 (App.Div. 1987). We add that this is the approach to the admission of evidence of DNA test results which has been taken in many other jurisdictions. See, e.g., United States v. Bonds, supra, 12 F.3d at 564-65; People v. Soto, supra, 35 Cal. Rptr.2d at 857-58; State v. Morel, supra, 676 A.2d at 1356; People v. Wesley, supra, 611 N.Y.S.2d at 103, 633 N.E.2d at 457.
We also note that even though the trial court's ruling at the conclusion of the Frye hearing permitted the State's experts to use the product rule in calculating the statistical significance of the match between the DNA print patterns of the bloodstain on defendant's jeans and the T-shirt used to cover the victim, the State elected at trial to present this part of its case by use of the more conservative statistical probabilities derived from the ceiling principle. Consequently, the State's experts testified in direct examination that the probability of a random match of the DNA profiles of the bloodstains found on the defendant's jeans and his T-shirt used to cover the victim was only 1 in 3.5 million. It was only on defendant's cross-examination of the State's experts that the 1 in 4.7 billion probability of a random match, derived from use of the product rule, was placed before the jury. Therefore, even if New Jersey were to adopt the approach of those jurisdictions *289 which have held that evidence of a DNA analysis using the RFLP method is admissible only if the statistical probability of a random match is calculated by use of the ceiling principle, see, e.g., State v. Bloom, supra, 516 N.W.2d 159; State v. Vandebogart, supra, 652 A.2d 671, the DNA evidence proffered by the State would have been properly admitted.
Furthermore, defendant was afforded a full opportunity to contest the State's evidence regarding the statistical significance of the match between the DNA profiles of the bloodstains taken from the defendant's jeans and the T-shirt used to cover the victim. Defendant presented testimony by Dr. Geisser similar to the testimony he gave at the Frye hearing, questioning the reliability of even the conservative ceiling principle methodology of calculating the probability of a match between DNA profiles. Dr. Shields also gave testimony similar to what he had given at the Frye hearing, that the results of one of Lifecodes' probes was unreliable and that, excluding the results of that probe and using the ceiling principle, there was a 1 in 6,899 chance of a random match between the DNA profiles of the bloodstains found on the jeans and the T-shirt. Thus, the jury heard substantially the same testimony as had been presented at the Frye hearing regarding the statistical significance of the match between the DNA evidence samples. Therefore, we conclude that the trial court properly admitted evidence of the population frequency of a match between the DNA profiles of the evidence samples involved in this case.
We turn next to defendant's challenge to the specific testing that Lifecodes conducted on those evidence samples. Defendant argues that the presence of "extra bands" on the autorads developed from two of the probes of the bloodstains taken from the jeans, which did not match any bands on the autorads developed from the same probes of the bloodstains found on the T-shirt, prevented an accurate DNA analysis. This argument rests on the testimony of Dr. D'Eustachio, who expressed the opinion that there was no data from which a reliable conclusion could be *290 reached as to the source of the extra bands. Consequently, according to Dr. D'Eustachio, the explanation for these extra bands could be that the bloodstains on the jeans came from more than one person.
However, the State's experts attributed the extra bands to a phenomenon known as "partial digestion," which is the failure of the enzyme used in the DNA testing to completely cut the DNA into fragments at the selected polymorphic sites. The State's experts also testified that the presence of extra bands on autorads is not uncommon, and that a person who is trained in reading autorads can distinguish, on the basis of the band's intensity and location, between those that reflect a person's DNA at a particular site and those that result from partial digestion. The State's experts further testified that the reading of autorads containing apparent extra bands to determine which bands reflect the DNA of the cell at a particular polymorphic site and the cause of the extra bands is a generally accepted aspect of the field of DNA analysis. Although the trial court did not make detailed findings of fact, it clearly accepted the opinion of the State's experts that the presence of extra bands on the autorads did not prevent an accurate match of the DNA on the jeans and the T-shirt. Since this implicit factual finding is reasonably based on sufficient credible evidence presented at the Frye hearing, it may not be disturbed on appeal. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
Although the presence of extra bands on the autorads developed from the bloodstains on the jeans complicated the DNA analysis in this case, courts do not exclude evidence of scientific tests simply because the results may be difficult to analyze or because there are conflicting expert opinions as to the conclusions that may be drawn from those tests. It is common, for example, for experts to dispute the clarity and significance of x-rays and sonograms. A trial court does not undertake to resolve such a dispute in determining the admissibility of the evidence but instead admits the evidence and instructs the jury that it must *291 determine the persuasiveness of the experts' opinions as part of its fact-finding responsibilities. We are satisfied that the trial court properly concluded that the ability of an expert to interpret the extra bands on an autorad, like an expert's ability to perceive an abnormality on an x-ray, is a matter within the province of the jury. See United States v. Jakobetz, supra, 955 F.2d at 799-800 ("[T]he threshold for admissibility should require only a preliminary showing of reliability of the particular data to be offered.").
We add that defendant was afforded a full opportunity to present evidence to the jury regarding the significance of the extra bands. Dr. D'Eustachio expressed the opinion at trial, as he had in the Frye hearing, that the Lifecodes DNA analysis failed to show a match between the print patterns of the bloodstains taken from defendant's jeans and the T-shirt because of the presence of extra bands.
In sum, the general acceptance within the scientific community of DNA analysis of human cells by use of the RFLP method is clearly established by authoritative scientific literature, the overwhelming weight of judicial authority throughout the country, and the testimony of the experts at the Frye hearing in this case. The only substantial debate within the scientific community regarding this method of DNA analysis relates to the calculation of the statistical significance of matches of DNA profiles. However, any dispute regarding the statistical significance of matching DNA profiles does not affect the general acceptance of DNA analysis within the scientific community and consequently should not result in the exclusion of such evidence in criminal trials. We also conclude that the State made a sufficient showing of the scientific reliability of Lifecodes' procedures and the results of its tests upon the bloodstain evidence involved in this case to justify the admission of those results.

II
During deliberations, the jury directed a written question to the trial court: "The panel wishes to know if a death penalty can be applied in this case?" In response, the court said:

*292 The answer to that question is no. If a death penalty was to be applied in the case you would have known that from the very first of this trial. The death penalty is not part of this case nor is it contemplated or even  it's just not part of the case. It cannot be applied.
That answers your question. That's it. Thank you. Return to your deliberations.
Although defendant did not object to this response at trial, he now argues that it was plain error for the court to answer this question because it sought information outside the jury's province. However, a trial court cannot decline to respond to a jury question merely because it relates to a matter that is irrelevant to a decision in the case. The court has a responsibility to guide the jury, which includes responding to any questions it may ask during deliberations. State v. Parsons, 270 N.J. Super. 213, 221, 636 A.2d 1077 (App.Div. 1994). If the jury inquires about an irrelevant matter, it may be appropriate in some circumstances for the court simply to inform the jury that the matter is irrelevant and that the court cannot provide an answer to the question. In other circumstances, however, this form of response may encourage jury speculation about an irrelevant subject that could improperly influence its deliberations. Therefore, it may be more appropriate in those circumstances for the court to answer the question but then to direct the jury "to exclude the subject from consideration." State v. Bey, 129 N.J. 557, 602, 610 A.2d 814 (1992) (quoting State v. White, 27 N.J. 158, 179, 142 A.2d 65 (1958)); see also State v. Engel, 249 N.J. Super. 336, 383, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991).
We are satisfied that the court's response to the jury's question was appropriate. Given the gruesome nature of the crime, the fact that the case took nearly three months to try, the complexity of much of the testimony, and the number of experts who testified, it is not surprising that the jury wondered whether the death penalty was involved. The court simply provided the jury with a direct and accurate response to this question. We see no basis for concluding that the jury's verdict was improperly influenced by its knowledge that the death penalty could not be imposed upon defendant.

*293 III
Defendant argues that the two-and-a-half year delay between his arrest and trial violated his right to a speedy trial under the United States and New Jersey Constitutions. U.S. Const. amend. VI; N.J. Const. art. I ¶ 10.
Initially, we note that defendant never moved to dismiss his indictment on speedy trial grounds. Therefore, this argument could be rejected solely on the ground that it was never presented to the trial court. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
In any event, defendant's speedy trial argument is clearly without merit. The factors applied in passing upon a speedy trial claim are: "(1) the length of the delay, (2) the reasons for the delay, (3) whether and how defendant asserted his speedy trial right, and (4) the amount of prejudice to defendant caused by the delay." State v. Long, 119 N.J. 439, 470, 575 A.2d 435 (1990) (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972)). Any delay caused by the defendant, such as by filing pretrial motions, is not considered in calculating the length of delay for speedy trial purposes. State v. Gallegan, 117 N.J. 345, 355, 567 A.2d 204 (1989).
As previously noted, defendant never asserted his right to a speedy trial. Furthermore, his claims of prejudice as a result of delay in commencement of the trial are completely speculative. Most significantly, even though the delay was substantial, defendant's efforts to obtain experts to counter the State's evidence regarding the DNA match between the bloodstains found on the T-shirt used to cover the victim and on defendant's jeans was the primary cause of that delay. The State provided defendant with the results of its DNA testing on November 12, 1990, which was ten and a half months after his arrest. Although defendant moved shortly thereafter for an order providing for the appointment of defense DNA experts, it took more than a year to resolve issues relating to their appointment, particularly the funding of their *294 work, and it took several additional months for these experts to prepare their reports. The presentation of evidence at the hearing dealing with the admissibility of this evidence then consumed twenty-eight days over a period of four and a half months. The trial court issued its opinion allowing the admission of this evidence one-and-a-half months later, and the trial commenced only a few weeks later. Consequently, the primary reasons for the delay in the commencement of defendant's trial were the complex issues relating to the admissibility of DNA evidence and defendant's protracted efforts to obtain his own DNA experts. In view of these legitimate and substantial reasons for the delay in defendant's trial, it is clear that his right to a speedy trial was not violated. See Commonwealth v. Lanigan, supra, 641 N.E.2d at 1345-46 (no speedy trial violation where a large part of the fifty-three month delay between arraignment and trial resulted from challenges to admission of DNA evidence and defendant could show no prejudice).
Affirmed.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C. Cir.1923).
[2] This description is derived from the testimony at the Frye hearing and from two reports of special committees of the National Research Council (NRC) discussed later in this opinion.
[3] The RFLP method, which was first introduced in 1975, has been utilized for medical research since 1978 and for forensic identification since 1985. The only reported decision in this State dealing with the admissibility of DNA test results in a criminal case involved the use of the PCR method. State v. Williams, 252 N.J. Super. 369, 379-83, 599 A.2d 960 (Law Div. 1991).
[4] For a more complete description of this method, including a helpful diagram, see Committee on DNA Technology in Forensic Science, National Research Council, DNA Technology in Forensic Science 3-5 (1992) (hereinafter "1992 NRC report").
[5] The existence of such independence is commonly referred to as Hardy-Weinberg equilibrium. See 1992 NRC report at 169.
[6] The NRC is a private, non-profit society of distinguished scholars which the National Academy of Sciences organized in 1916 at the request of the President and which is now administered by the National Academy of Sciences, the National Academy of Engineering and the Institute of Medicine. See Ex. Ord. No. 2859, as amended by Ex. Ords. No. 10668 & 12832, reprinted in 1995 pocket part to 36 U.S.C.A. § 253 at 24-25. The NRC formed the Committee on DNA Technology in Forensic Science to study the use of DNA analysis for forensic purposes, which resulted in the issuance of the 1992 NRC report. Subsequently, at the request of the Director of the FBI, the NRC formed a new committee, called the Committee on DNA Forensic Science, to study recent developments in the field, which resulted in the issuance of the 1996 NRC report. See Preface to the 1996 NRC report.
[7] There are a variety of other issues that may arise in connection with the DNA analysis of particular evidence samples, including the competency of the persons doing the testing and analysis, contamination or degradation of the evidence samples, the criteria for determining a match between the DNA print patterns of evidence samples, and the adequacy of the data base used to calculate the statistical significance of matching DNA profiles. See 1992 NRC report at 56-63. However, these issues all relate to the reliability of the DNA testing of specific evidence samples rather than the general acceptance within the scientific community of DNA analysis using the RFLP method. The only such issue raised on this appeal relates to the presence of "extra bands" on two of Lifecodes' probes of the bloodstains found on defendant's jeans, which is discussed on pp. 289-291, 683 A.2d at 232-233 of this opinion.
[8] An "allele" is a fragment of DNA at a polymorphic site.
[9] This report described the calculation of the statistical frequency of a matching DNA profile under the ceiling principle, as follows:

(1) Draw random samples of 100 persons from each of 15-20 populations that represent groups relatively homogeneous genetically.
(2) Take as the ceiling frequency the largest frequency in any of those populations or 5%, whichever is larger.
[1992 NRC report at 13.]
[10] We note that although there has been debate among experts in the field as to whether the ceiling principle, the product rule or a modified version of the product rule should be used in calculating the statistical significance of a match of DNA profiles, there seems to be limited, if any, support for Dr. Geisser's view that the probability of random matches of separate DNA print patterns should not be combined at all in determining the statistical significance of the match.