902 A.2d 1212

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CLARENCE M. MOORE, DEFENDANT–APPELLANT.

Argued March 15, 2004—Remanded April 27, 2004—Reargued October 24, 2005—Decided August 10, 2006—Corrected August 21, 2006.

*Paul J. Casteleiro* argued the cause for appellate.

*Jack J. Lipari* and *James P. McClain,* Assistant Prosecutors, argued the cause for respondent (*Jeffrey S. Blitz,* Atlantic County Prosecutor, attorney; *Mr. Lipari,* on the briefs).

*Christopher D. Adams* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Walder, Hayden & Brogan,* attorneys).

*Matthew Astore,* Assistant Deputy Public Defender, argued the cause for amicus curiae Office of The Public Defender (*Yvonne Smith Segars,* Public Defender, attorney).

*Nancy A. Hulett,* Special Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Peter C. Harvey,* Attorney General, attorney).

Chief Justice PORITZ delivered the opinion of the Court.

This case returns to the Court after remand for a plenary hearing in respect of the continued viability of *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981), wherein the Court established

guidelines for the admissibility of hypnotically refreshed testimony proffered by a witness in a criminal trial. Based on the record developed below, and the substantial body of case law that has considered the question since *Hurd* was decided, we have determined that a change in course is now warranted. We are no longer of the view that the *Hurd* guidelines can serve as an effective control for the harmful effects of hypnosis on the truth-seeking function that lies at the heart of our system of justice. Most important, we are not convinced that it is possible to know whether post-hypnotic testimony can ever be as reliable as testimony that is based on ordinary recall, even recognizing the myriad of problems associated with ordinary recall. We therefore conclude that the hypnotically refreshed testimony of a witness in a criminal trial is generally inadmissible and that *Hurd* should no longer be followed in New Jersey.

## I.

At approximately 2:30 a.m. on the morning of January 14, 1986, twenty-five-year-old M.A. was sleeping in the bedroom of her Somers Point cottage when a man woke her by grabbing her neck and demanding money. The man repeatedly sexually assaulted and threatened her, telling her not to look at him when, at one point, she opened her eyes. After the assault, M.A. remained in her bed for four hours, fearing that the man was still in the house. At daylight, she sought assistance from a neighbor, who contacted the police. According to the police report, when the police arrived, M.A. stated that she thought her attacker might be an African–American man of medium build.

Later in the day, M.A. provided a written statement to the police in which she described her assailant as black, about five feet ten inches, 175 pounds, in his late twenties to mid-thirties, with short hair and a short beard close to his face. She also indicated that she saw him only once and that he was wearing jeans. Because she was unable to provide sufficient information to develop a composite sketch of her attacker, M.A. suggested hypnosis.

She anticipated that hypnosis might help her to remember her assailant's face in greater detail.

On January 30, 1986, M.A. visited the office of Dr. Samuel Babcock, a licensed clinical psychologist, to undergo hypnosis. Dr. Babcock first conducted a tape-recorded interview with Detective Gary Gray of the Somers Point Police Department to acquire background information on the assault. He then met privately with M.A. to conduct a pre-hypnotic interview. In that tape-recorded interview, M.A. described the lighting conditions in her bedroom at the time of the assault. She explained that "[t]here's not much [light], some, a little bit of light comes through the window but there was no light in my house, no lights were on[,] it's pretty dark." She stated that a thin curtain covers the bedroom window and that the light was "enough to see ... shadows and stuff ... outlines of things, ... but ... nothing in detail."

Also pre-hypnosis, M.A. remembered seeing the perpetrator's face only once, when he was standing over her bed. She stated that the assailant "kept telling [her] over and over to keep [her] eyes closed and not to look at him[,] which [she] did." She further stated that "at one point ... [she thought she] looked up at him and he immediately told [her] to not look up and to close [her] eyes[,] which [she] did and that was the only time [she] really saw him[;] ... [she] was afraid to look at him." As a result, besides knowing that he was black, and that he had "what looked like a real light beard or more like shadows on his face[,] ... nothing about his face caught [her] attention." She did not remember anything distinctive about either his eyes or his nose, but she thought he had a round face and that his legs looked as though they were muscular and stocky.

Dr. Babcock switched off the tape recorder for two minutes before initiating hypnosis. During that period, he observed M.A. remove her contact lenses. Consequently, with the recorder again switched on, he asked how well she could see without them. M.A. responded that if an object is "a couple feet away ... all I see is

blur," and that her assailant had been "close enough to see but not in detail." While hypnotized, M.A. stated for the first time that she thought her assailant wore a tan suede jacket with a zipper and that he was a medium-skinned black male. As the session was ending but prior to bringing M.A. out of hypnosis, Dr. Babcock advised her that she would not be able to remember what they talked about, but that she "will remember the face [of her assailant], crystal clear, very clearly." Then, to ease her transition to a waking state, Dr. Babcock told her to sleep and switched off the tape during the last minutes of the session.

A few days later, M.A. chose defendant Clarence Moore from a photo array. Subsequently, she identified him from two more arrays, one of which was actually a photograph of a lineup. Moore was the only person common to all three. When she looked at the initial array, M.A. advised detectives that she recalled dirt near or on the pockets of her assailant's tan suede jacket.

On February 20, 1986, a grand jury in Atlantic County charged Moore with burglary in violation of *N.J.S.A.* 2C:18–2, robbery in violation of *N.J.S.A.* 2C:15–1a(2) (robbery with threat of immediate bodily injury), robbery in violation of *N.J.S.A.* 2C:15–1a(3) (robbery with commission of or threat to commit a first- or second-degree crime), and three counts of aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(3). Following pretrial hearings, the trial court ruled that M.A.'s hypnosis complied with this Court's decision in *Hurd, supra,* which established standards for the admission of hypnotically refreshed testimony at criminal trials. The court therefore permitted M.A.'s testimony as refreshed recollection. The court also permitted the State to play a substantial portion of the recording of the hypnotic session for the jury. After a *Wade*[1] hearing, the court further ruled that the

---

[1] *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967) (holding criminal defendant entitled to hearing to determine whether identification is tainted by suggestiveness of pretrial procedures).

188

victim's out-of-court and in-court identifications of Moore were sufficiently reliable to be admitted at trial.

Moore's jury trial began on February 18 and concluded on March 5, 1987. Dr. Babcock, M.A., and several police investigators testified for the State. As permitted by the court, the State also played a portion of the audiotapes of Dr. Babcock's session with M.A., including the pre- and post-hypnotic interviews, and provided transcripts of the tapes to the jury. Other than this testimony, the State offered no corroborating evidence of M.A.'s identification of Moore.[2]

On the witness stand, M.A. made an in-court identification of Moore as the person who assaulted her. She admitted that during the attack she caught only a "glimpse" of his face in what could have been but a "split second" or "could have been more than that." M.A. maintained, however, that the glimpse was "enough to remember" and that Moore's face "was the same face." She further stated that there was "no question" but that the person she identified in the photo arrays was her assailant, recounting that when she picked Moore's photo she "recognize[d] that face, everything about it." Although she had described a person with a light beard during the police investigation (Moore actually had a mustache at the time of the assault), when she first identified Moore's photograph, M.A. testified, she "wasn't concerned with a beard or a mustache or any kind of facial hair[;][she] was just looking at the whole face." In respect of the lighting conditions in her bedroom, M.A. testified that there was enough light to see facial features and to "remember someone." She also indicated that she was not wearing her contact lenses during the assault, but that she was able to see without them and, in fact, had driven without her lenses. When confronted with her prior statements regarding her inability to see objects more than a few feet away

---

[2] M.A. testified that she recognized defendant's tan suede jacket and that it was the same as the jacket worn by her assailant; however, her recall of the jacket was derived from her hypnotically refreshed memory.

without her contacts, M.A. responded that "before I was hypnotized that was accurate."

Finally, when questioned about the tan suede jacket she had identified, M.A. repeatedly stated she was sure it was the jacket worn by her assailant because she "could remember picturing him wearing it." A sergeant with the Atlantic County Prosecutor's Office testified at trial that M.A. knew the police had removed clothing from his house and that she may have been advised specifically that the clothes she was asked to identify were taken from his house. The sergeant also admitted that there was no other suede garment among the clothes M.A. viewed.

Most important, M.A. acknowledged that her recollection of her assailant had been altered by her hypnotic experience. She explained that hypnosis made her assailant's face "much clearer" with "the features ... more detailed," that "[i]t was much easier to describe [his face] in more detail afterwards," and that her vision of his face and clothing appeared "brighter." Asked whether she would have recognized her assailant prior to being hypnotized, M.A. replied, "I think so, but I couldn't have been positive." She conveyed in her testimony a clear and strong conviction that Moore was the person who assaulted her.

The defense presented Clarence Moore's wife, who testified that she did not remember the specific night in question, but believed her husband was at home because she would have known had he not been in bed at the time of the offense. She explained that she had been ill after the birth of their child and that at that time her husband cared for her during the night.

The jury convicted Moore on all counts and the trial court denied his motion for a new trial. The Appellate Division upheld Moore's conviction, although the matter was remanded for resentencing. After this Court denied Moore's Petition for Certification in September 1991, *State v. Moore*, 126 *N.J.* 388, 599 *A.*2d 165 (1991), Moore sought post-conviction relief. His claim of ineffective assistance of counsel was denied by the Law Division and on appeal. *State v. Moore*, 273 *N.J.Super.* 118, 641 *A.*2d 268 (App.

Div.), *certif. denied,* 137 *N.J.* 311, 645 *A.*2d 139 (1994). Subsequently, in April 1997, Moore petitioned for a writ of habeas corpus to the United States District Court for the District of New Jersey. The district court denied the petition in August 1998, but granted Moore's motion for a certificate of appealability to the United States Court of Appeals for the Third Circuit under 28 *U.S.C.A.* § 2253(c)(2). In June 2001, the Third Circuit overturned the district court's denial of Moore's habeas petition and directed the district court to grant the writ. *Moore v. Morton,* 255 *F.*3d 95, 120 (3d. Cir.2001). Based primarily on prosecutorial misconduct, including racist comments during summation, the Third Circuit held that "Moore's trial was so infected with unfairness that he was denied due process." [3] *Ibid.*

When the State sought to retry Moore, he made certain pretrial motions, including a motion to dismiss the indictment based on prosecutorial misconduct before the grand jury; a motion to dismiss the indictment on double jeopardy grounds; a motion holding hypnotically assisted testimony inadmissible or, alternatively, suppressing M.A.'s hypnotically assisted testimony; a motion admitting expert testimony on eyewitness identification; and a motion compelling an evidentiary hearing to determine why potentially exculpatory evidence could not be located. Following argument on June 21, 2002, the trial court dismissed the indictment because the State had failed to inform the grand jury that M.A.'s memory had been hypnotically refreshed before she testified. The trial court denied Moore's other motions and found that, based on the law of the case, M.A.'s testimony could be presented in a subsequent trial against defendant if a new indictment issued.

The State appealed the dismissal of Moore's indictment and Moore cross-appealed the denial of his other motions. On July 22, 2003, the Appellate Division held that there was no prejudicial prosecutorial error in the grand jury presentation. Nonetheless, the panel ordered the trial court to conduct a hearing on the

---

[3] Moore was subsequently released on $100,000 bail.

admissibility of hypnotically refreshed eyewitness testimony, explaining that Moore's motion for a hearing on that issue was not barred by the law of the case doctrine. The panel affirmed the denial of Moore's other motions.

In August 2003, Moore petitioned this Court for certification. He asked the Court to decide, among other things, whether *Hurd, supra*, 86 *N.J.* 525, 432 *A*.2d 86, remained viable law. The Court granted the petition without limitation. *State v. Moore*, 178 *N.J.* 249, 837 *A*.2d 1092 (2003). However, after oral argument, the Court determined that the record was inadequate for consideration of the continued validity of *Hurd.* The matter therefore was remanded to the trial court for a plenary hearing on the question "whether the assumptions and other factors reflected in *Hurd* regarding hypnotically-induced testimony remain valid and appropriate." *State v. Moore*, 180 *N.J.* 459, 461, 852 *A*.2d 1073 (2004). The Court retained jurisdiction. *Ibid.*

On remand, the trial court heard testimony from three experts. *See, infra*, 188 *N.J.* at 203–04, 902 *A*.2d at 1224–25. The court concluded that hypnotically refreshed testimony should be precluded; that "at the very least," the *Hurd* guidelines should be supplemented; and that, regardless of the decision on those two issues, M.A.'s testimony should be barred because Dr. Babcock did not comply with the *Hurd* guidelines.

Pursuant to our remand Order, the parties filed briefs with the Court. The State urges the Court not to adopt a per se bar on hypnotically refreshed testimony. Rather, the State advocates a "totality of the circumstances" test in each case to determine the reliability of such evidence. Further, the State argues, M.A.'s post-hypnotic testimony should be permitted because the hypnosis was conducted in compliance with the *Hurd* guidelines. Moore urges the Court to adopt the trial court's conclusions and to find hypnotically refreshed testimony unreliable and inadmissible against a criminal defendant.

The Court admitted as *amici* the Attorney General, the Public Defender, and the Association of Criminal Defense Lawyers of

New Jersey, who submitted briefs and participated at oral argument.

## II.

Twenty-five years ago, in *State v. Hurd*, this Court was presented for the first time with the question "whether the testimony of a witness who has undergone hypnosis to refresh her recollection is admissible in a criminal trial and, if so, in what circumstances." 86 *N.J.* at 529, 432 *A.*2d 86. After reviewing the expert testimony presented to the trial court, including the scientific literature available at the time, we held that a witness who has been hypnotized in an attempt to improve his or her recollection may testify at trial "subject to strict safeguards to ensure the reliability of the hypnotic procedure." *Ibid.* Because we have been asked to reconsider our determination in *Hurd*, the construct on which that case was grounded is integral to our decision.

In certain respects the facts undergirding the *Hurd* decision are similar to the facts here. In *Hurd*, Jane Sell had been attacked and stabbed while she was sleeping in her apartment. *Ibid.* She was unable to identify her attacker, and consequently, the prosecutor's office recommended that she try hypnosis as a means of enhancing her recall. Sell agreed and, with two officers and a medical student present, underwent hypnosis by a psychiatrist. *Id.* at 530, 432 *A.*2d 86. During the hypnotic session one of the officers asked her if the attacker was her ex-husband, Paul Hurd. Although she responded "[y]es," she was uncomfortable with her identification when she first came out of hypnosis. *Id.* at 531, 432 *A.*2d 86. Days later, however, Sell came to the police station and identified Hurd as her attacker. *Id.* at 532, 432 *A.*2d 86.

Hurd was charged with assault and other crimes. Before trial, he moved to suppress Sell's identification, arguing that the use of hypnotically refreshed testimony was per se inadmissible under the then-prevailing standard for the admissibility of scientific evidence established in *Frye v. United States*, 293 *F.* 1013

(D.C.Cir.1923).[4]  *Hurd,* 86 *N.J.* at 532, 432 *A.*2d 86.  The trial court suppressed the identification, finding that hypnotically refreshed testimony was not per se inadmissible, but that the potential for post-hypnotic confabulation [5] necessitated safeguards before such testimony could be permitted.  The court established six procedural safeguards suggested by defense expert Dr. Martin Orne; however, as the safeguards were not satisfied in respect of Sell's hypnosis, her testimony was deemed inadmissible.  *Id.* at 532–33, 432 *A.*2d 86.  The State sought leave to appeal, which was denied by the Appellate Division, but granted by this Court, *State v. Hurd,* 85 *N.J.* 133, 425 *A.*2d 289 (1980).

At the outset, the *Hurd* Court traced the evolution of hypnosis as a "memory recall" procedure.  *Hurd,* 86 *N.J.* at 534, 432 *A.*2d 86.  The Court observed that most courts considering the question had ruled that hypnotically induced testimony "should be treated like any other present recollection refreshed."  *Id.* at 535, 432 *A.*2d 86.  At that time, only a few courts had held such testimony per se inadmissible in a criminal trial based on a finding that hypnosis was not generally accepted by experts in the field.  *Id.* at 535–36, 432 *A.*2d 86 (citing *State v. Mena,* 128 *Ariz.* 226, 624 *P.*2d 1274 (1981); *State v. Mack,* 292 *N.W.*2d 764 (Minn.1980)).  The *Hurd* Court agreed that "hypnotically refreshed testimony must satisfy the standard of acceptability for scientific evidence before it is admissible in a criminal trial, but found that it met the standard."  *Id.* at 536, 432 *A.*2d 86.  More specifically, the Court held that the procedure used to stimulate hypnotic recall must be capable of producing reliable results, and that the worth of the

---

[4] *Frye* held that evidence or expert testimony based on scientific techniques is inadmissible unless generally accepted as reliable in the relevant scientific community.  293 *F.* at 1014.

[5] Confabulation occurs when hypnotized individuals unconsciously fill in the gaps in their memories with imagined material.  Daniel R. Webert, Note, *Are the Courts in a Trance?  Approaches to the Admissibility of Hypnotically Enhanced Witness Testimony in Light of Empirical Evidence,* 40 *Am.Crim. L.Rev.* 1301, 1305 (2003).

evidence must outweigh the disadvantages of confusion and consumption of resources that would occur every time expert testimony is needed to evaluate the reliability of hypnotic procedures. *Id.* at 536–37, 432 *A.*2d 86.

The Court reasoned that hypnosis need not be "generally accepted as a means of reviving truthful or historically accurate recall," *id.* at 537, 432 *A.*2d 86; rather, the procedure would be considered "reasonably reliable if [in a particular case] it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate." *Id.* at 538, 432 *A.*2d 86. Most important in respect of the question before us today, the *Hurd* Court reviewed the substantial extant authority discussing problems associated with post-hypnotic memory, noting that "while hypnosis often can produce remarkably accurate recall, it is also prone to yield sheer fantasy, willful lies, or a mixture of fact with gaps filled in by fantasy." *Ibid.* Citing Dr. Orne, the Court recognized three troubling concerns: that a person undergoing hypnosis is extremely vulnerable to suggestion, which even an expert observer may not be able to identify; that such a person loses critical judgment, and consequently will speculate and respond with greater confidence than other persons; and that memories evoked under hypnosis are often confounded with prior recall. *Id.* at 539–40, 432 *A.*2d 86. Despite those concerns, the Court concluded that "a rule of per se inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." *Id.* at 541, 432 *A.*2d 86.

Because the Court found that hypnotically refreshed testimony, in appropriate circumstances, could be as reliable as ordinary recall, it held that such testimony would be "admissible in a criminal trial if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." *Id.* at 543, 432 *A.*2d 86. To aid in that determination, the Court adopted the procedural safeguards suggested by Dr. Orne and directed trial courts to

"evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed." *Ibid.* Under the safeguards, "a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session"; that person "should be independent of and not regularly employed by the prosecutor, investigator or defense"; "any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form"; the hypnotist must elicit a detailed description of the facts from the subject before hypnosis; "all contacts between the hypnotist and the subject must be recorded"; and "only the hypnotist and the subject should be present during any phase of the hypnotic session." *Id.* at 545–46, 432 *A.*2d 86. The burden of proof, by clear and convincing evidence, was assigned to the party offering the hypnotically refreshed testimony. *Id.* at 546–47, 432 *A.*2d 86.

On the facts before it, the Court found that the State had "failed to meet its burden ... by clear and convincing evidence" because the procedural safeguards were not satisfied, because there was a genuine possibility of suggestiveness both during and after hypnosis, and because the identification was not corroborated. *Id.* at 548–49, 432 *A.*2d 86. Justice Sullivan, joined by Justice Clifford, concurred in that result but rejected the "use [of hypnotically induced testimony] against a defendant in a criminal trial" based on its unreliability. *Id.* at 550, 432 *A.*2d 86. (Sullivan, J., concurring in result).

## III.

### A.

Although *Hurd* introduced a new paradigm for the admission of post-hypnotic testimony, other courts had considered the issue prior to the *Hurd* decision. In the early cases, the courts "refused to admit any evidence purportedly induced, refreshed or enhanced by hypnosis." *Roark v. Commonwealth,* 90 *S.W.*3d 24, 31 (Ky.

2002) (citing *People v. Ebanks*, 117 *Cal.* 652, 49 *P.* 1049, 1053 (1897)). It was not until 1968 that any court concluded otherwise. *Harding v. State*, 5 *Md.App.* 230, 246 *A.*2d 302 (1968), *cert. denied*, 252 *Md.* 731 (1969), *cert. denied*, 395 *U.S.* 949, 89 *S.Ct.* 2030, 23 *L.Ed.*2d 468 (1969). In *Harding*, the Maryland Court of Special Appeals decided that when a witness's testimony is refreshed by hypnosis, the question is not whether the evidence is admissible, but rather, whether the witness is credible. *Id.* at 306.

After *Harding*, a number of courts "followed its lead in holding that a witness's testimony having been refreshed by hypnosis goes only to credibility and not admissibility." *State v. Peoples*, 311 *N.C.* 515, 319 *S.E.*2d 177, 183 (1984) (citing, *e.g.*, *Creamer v. State*, 232 *Ga.* 136, 205 *S.E.*2d 240 (1974); *Pearson v. State*, 441 *N.E.*2d 468 (Ind.1982)). Various of those courts regarded "the challenged testimony as still being based on the witness's actual current recollection, notwithstanding that the recollection was enhanced through hypnosis." *Burral v. State*, 352 *Md.* 707, 724 *A.*2d 65, 71 (Md.), *cert. denied*, 528 *U.S.* 832, 120 *S.Ct.* 89, 145 *L.Ed.*2d 75 (1999) (citing, *e.g.*, *Clark v. State*, 379 *So.*2d 372, 375 (Fla.Dist.Ct. App.1979)); *see also State v. McQueen*, 295 *N.C.* 96, 244 *S.E.*2d 414, 427–28 (1978), *overruled by Peoples, supra*, 311 *N.C.* 515, 319 *S.E.*2d 177. Some viewed hypnotically refreshed testimony as no different than testimony "revived by more traditional methods, such as reviewing a particular document." *Burral, supra*, 724 *A.*2d at 71 (citing *Kline v. Ford Motor Co., Inc.*, 523 *F.*2d 1067, 1070 (9th Cir.1975); *Clark, supra*, 379 *So.*2d at 375).

Yet other courts began to question the reliability of hypnotically refreshed testimony. *See, e.g., People v. Shirley*, 31 *Cal.*3d 18, 181 *Cal.Rptr.* 243, 723 *P.*2d 1354, *cert. denied*, 459 *U.S.* 860, 103 *S.Ct.* 133, 74 *L.Ed.*2d 114 (1982); *State v. Collins*, 296 *Md.* 670, 464 *A.*2d 1028 (1983). Since *Harding*, as the Florida Supreme Court noted, "hypnosis has taken a rollercoaster ride through the courts, finding favor in some states, uncertainty in others, and complete disfavor in still others." *Stokes v. State*, 548 *So.*2d 188, 190 (Fla.1989). As discussed above, in 1981 this Court decided in

*Hurd* that, in a particular case, with safeguards and in circumstances indicating "recall comparable in accuracy to normal human memory," post-hypnotic testimony should be admitted. 86 *N.J.* at 543, 432 *A.*2d 86. *Hurd* was followed in some jurisdictions that either adopted the *Hurd* safeguards or other similar requirements. *See, e.g., House v. State,* 445 *So.*2d 815, 826–27 (Miss. 1984); *State v. Beachum,* 97 *N.M.* 682, 643 *P.*2d 246, 253–54 (App.1981), *cert. quashed,* 98 *N.M.* 51, 644 *P.*2d 1040 (1982). Yet other courts, applying the prevailing rule governing the admissibility of scientific evidence set forth in *Frye, supra,* decided that the use of hypnosis to refresh memory had not been accepted as reliable within the relevant scientific community. The Minnesota Supreme Court, in 1980, had ruled that such testimony would be inadmissible in Minnesota, and a number of courts followed suit. *State v. Mack,* 292 *N.W.*2d 764, 765 (Minn.1980); *see also Shirley, supra,* 181 *Cal.Rptr.* 243, 723 *P.*2d at 1355; *Collins, supra,* 464 *A.*2d at 1044–45. In *Mack,* the court declared: "[T]he best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation—a filling of gaps with fantasy. Such results are not scientifically reliable...." *Mack,* 292 *N.W.*2d at 768. Most courts that have considered the issue since *Mack* have adopted its conclusions.[6]

By way of example, in 1982 the California Supreme Court issued a seminal decision in the *Mack* line of cases. *Shirley, supra,* 181 *Cal.Rptr.* 243, 723 *P.*2d at 1354. *Shirley* outlined the various approaches to hypnosis, describing the cases that excluded hypnotically refreshed evidence "on the ground of the well-known *Frye* rule," *id.* at 243, 723 P.2d at 1362; the *Harding* line of cases that held hypnotically refreshed testimony admissible, *id.*; and the

---

[6] Even Maryland, which fifteen years earlier had been the first state to allow hypnotically refreshed testimony, changed course in 1983 and followed the *Mack* approach. *Collins, supra,* 464 *A.*2d at 1043–45 (declining to follow *Hurd* because of delay and confusion procedural safeguards would inject into judicial process and because court was "not satisfied that hypnotically enhanced testimony meets the *Frye* ... test").

*Hurd* line of cases that adopted procedural safeguards to amelio-
rate concerns about reliability, *id.* The court concluded that the
*Hurd* safeguards do not address the risk of confabulation and the
unwarranted confidence of a hypnotized subject in his or her
recollection. Even improved requirements "could [not] be admin-
istered in practice without injecting undue delay and confusion
into the judicial process." *Id.* "[T]he game," said the court, "is
not worth the candle." *Ibid.*

Most important in the context of our inquiry in this case, the
California court relied on "major voices in the scientific community
[that] oppose[d] the use of hypnosis to restore the memory of
potential witnesses, with or without procedural safeguards, on the
ground of its intrinsic unreliability." *Id.* Those voices spoke of
problems associated with hypnosis: of suggestiveness that may be
unintended, or even unperceived, by the hypnotist; of confabula-
tion that receives unwarranted credence; of the inability of expert
witnesses and lay observers to distinguish between true memories
and pseudomemories; and of increased confidence in recall that is
unwarranted and renders cross-examination largely ineffective.
*Id.* at 243, 723 *P.*2d at 1382–83. The court determined that "the
testimony of a witness who has undergone hypnosis for the
purpose of restoring his memory of the events in issue is inadmis-
sible as to all matters relating to those events, from the time of
the hypnotic session forward." *Id.*

The California Supreme Court decided *Shirley* in 1982. In
*People v. Guerra,* 37 *Cal.*3d 385, 208 *Cal.Rptr.* 162, 690 *P.*2d 635,
661 (1984), two years later, the court took note of "Dr. Orne's
repudiation of the approach taken in his name." Indeed, Dr.
Orne's rejection of a guidelines approach emerged as a significant
factor in later court decisions that barred hypnotically refreshed
testimony. *See, e.g., Stokes, supra,* 548 *So.*2d at 195–96 (relying,
in part, on Dr. Orne's repudiation of guidelines approach to hold
hypnotically refreshed testimony inadmissible). In an article enti-

tled "Hypnotically Induced Testimony," published in 1984, Dr. Orne, writing with three colleagues, explained that the guidelines, while helpful to ensure that a hypnotic session is conducted properly, " 'do not prevent (nor is there any reliable way to prevent) subjects from confounding distorted hypnotic memories with prior and subsequent nonhypnotic recall or from placing undue confidence in these distorted recollections.' " *Guerra*, 208 *Cal.Rptr.* 162, 690 *P.*2d at 661 (quoting Orne et al., *Hypnotically Induced Testimony*, in Eyewitness Testimony: Psychological Perspectives 171, 210 (Wells & Loftus eds., 1984)). Also, in 1984, a committee of the American Medical Association Council on Scientific Affairs, which Dr. Orne chaired, declared that " 'recollections under hypnosis are too shaky for the witness stand.' " *Roark*, *supra*, 90 *S.W.*3d at 31 (citations omitted).

Finally, we note one other trend in respect of this issue. Nine states have adopted an alternative to the three approaches previously discussed (per se admissibility, procedural safeguards, and per se inadmissibility) known as the ad hoc approach. *See, e.g.*, *State v. Iwakiri*, 106 *Idaho* 618, 682 *P.*2d 571, 578 (1984); *State v. Armstrong*, 110 *Wis.*2d 555, 329 *N.W.*2d 386, 394–96 (1983). Those jurisdictions place "the burden on the state in each case to satisfy the trial court that the testimony of witnesses previously subjected to hypnotism is reliable." *State v. Seager*, 341 *N.W.*2d 420, 429 (Iowa 1983). Sometimes referred to as the "totality of the circumstances" test, *Burral, supra*, 724 *A.*2d at 75, this approach considers, among other things, whether the purpose of the hypnosis was therapeutic or investigative, whether corroborating evidence exists, and whether the post-hypnotic recollection was substantially similar to the pre-hypnotic recollection. The Supreme Court of Colorado, for example, has held that in determining admissibility, trial courts must consider the level of training and independence of the hypnotist, whether all contacts between the witness and the hypnotist were recorded, the circumstances under which the hypnosis occurred, and the appropriateness of hypnosis for the kind of memory loss involved. *People v. Romero*, 745 *P.*2d 1003, 1017 (Colo.1987), *cert.*

*denied,* 485 *U.S.* 990, 108 *S.Ct.* 1296, 99 *L.Ed.*2d 506 (1988). *But see Contreras v. State,* 718 *P.*2d 129, 137–38 (Alaska 1986) (rejecting case-by-case approach because it "is time consuming, creates a risk of non-uniform results and requires judges to become hypnosis experts in order to make intelligent determinations"); *People v. Zayas,* 131 *Ill.*2d 284, 137 *Ill.Dec.* 568, 546 *N.E.*2d 513, 516 (1989) (noting that rule of per se inadmissibility "relieves trial judges of the burden of determining the quality of such evidence and relieves jurors of the responsibility of determining its credibility, tasks which neither are particularly well suited to perform because of the nature of this evidence"); *Commonwealth v. Kater,* 388 *Mass.* 519, 447 *N.E.*2d 1190, 1196 (1983) (finding that questionable reliability of hypnotically refreshed memory suggests "it is simply not worth miring the judicial process in individual determinations").[7]

In sum, as one of our sister courts commented four years ago, "[p]erhaps no issue in the law of evidence has been more hotly debated over the past twenty-five years than the admissibility of testimony by a witness who has been previously subjected to hypnotism." *Roark, supra,* 90 *S.W.*3d at 29. Today, as the debate continues, four states consider hypnotically refreshed testimony per se admissible, with the trier of fact determining its weight, *id.* at 31–32; six allow such testimony when certain procedural safeguards are met, *id.* at 34; twenty-six have adopted variations on the per se inadmissible rule, *id.* at 32; and nine have adopted some type of "totality of the circumstances" test, *id.* at 35.

## B.

The four approaches described above had been adopted in at least some states by 1987, when the United States Supreme Court

---

[7] The *Hurd* procedural safeguards have been similarly criticized. *See Alsbach v. Bader,* 700 *S.W.*2d 823, 827 (Mo.1985) (en banc) (stating that "[t]he administration of procedural safeguards would lead to elaborate demands for discovery, expert witnesses, and special pretrial hearings, and accordingly inject undue delay, confusion and costs into the judicial process.").

decided *Rock v. Arkansas,* 483 *U.S.* 44, 107 *S.Ct.* 2704, 97 *L.Ed.*2d 37 (1987). In *Rock,* the Court concluded that a defendant could not be denied his constitutional right to testify because of a state rule that excluded post-hypnotic testimony. The Court determined that the "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61, 107 *S.Ct.* at 2714, 97 *L.Ed.*2d at 52.

We note that in response to *Rock,* the Florida Supreme Court has modified its per se inadmissibility rule "to the extent it affects a defendant's testimony or statements made to experts by a defendant in preparation of a defense." *Morgan v. Florida,* 537 *So.*2d 973, 976 (Fla.1989). The Court imposed safeguards in such cases, however, as a means of improving the reliability of a defendant's post-hypnotic testimony. *Ibid.* In addition, Maryland's highest court has considered whether the rationale of *Rock* applies to other defense witnesses, and determined that "[t]here is no doubt but that *Rock* itself was carefully confined to the testimony of the defendant." *Burral, supra,* 724 *A.*2d at 79.

## C.

While our sister states were grappling with the issue, the admission of hypnotically refreshed testimony came to this Court a second time ten years ago when, in 1996, we heard *State v. Fertig,* 143 *N.J.* 115, 668 *A.*2d 1076 (1996). In that case, we declined on technical grounds an invitation to revisit the admissibility question, but expressed a heightened concern about the reliability of post-hypnotic testimony. *Id.* at 124–27, 668 *A.*2d 1076. We reiterated the requirement that hypnotic sessions conform to the *Hurd* guidelines and requested that our Committee on Model Criminal Jury Charges prepare a model jury charge to inform the jury of the dangers inherent in such testimony. *Ibid.*

*Fertig* concerned a felony murder trial in which the primary witness for the State had been hypnotized prior to trial. Based on

expert testimony criticizing the hypnotist's techniques, the trial court concluded that the hypnotic session violated the *Hurd* guidelines. *Id.* at 119–23, 668 *A.*2d 1076. Before our Court, the defendant asked that we "reconsider *Hurd* and adopt a rule of per se inadmissibility of hypnotically-refreshed testimony" or, alternatively, that we "require courts to instruct the jury about the problems with such testimony." *Id.* at 124, 668 *A.*2d 1076. Because the defendant had not raised the *Hurd* issue below, and a record had not been developed, the Court declined to address it. *Ibid.*

Justice Pollock, writing for a unanimous Court, stated that we would be "remiss, however, if we failed to note several significant developments since we decided *Hurd.*" *Ibid.* He pointed out that twenty-six courts had held hypnotically refreshed testimony per se inadmissible, and that Dr. Orne, the proponent of the *Hurd* guidelines, "now believes that procedural safeguards cannot fully protect against admission of testimony in which the witness confuses hypnotic pseudomemory with waking recall." *Id.* at 124–25, 668 *A.*2d 1076. Acknowledging that only four states then considered hypnotically refreshed testimony "generally admissible," *id.* at 125, 668 *A.*2d 1076, Justice Pollock nonetheless concluded that despite "the problems posed by hypnotically-refreshed testimony, [the Court would not] abandon *Hurd* in the absence of a more complete record." *Ibid.* In response to the defendant's request, the Court took an additional step to protect against jurors' misconceptions about hypnosis by directing trial courts admitting hypnotically refreshed testimony to "instruct the jury of the effect that hypnosis may have on that testimony." [8] *Id.* at 127, 668 *A.*2d 1076.

In this case, we are asked once again to consider whether a witness's hypnotically refreshed testimony should be admissible as part of the State's case against a defendant. When the case first

---

[8] *See Model Jury Charges (Criminal),* Hypnotically Refreshed Testimony (June 20, 1996).

came to us in August 2003, we were concerned about the record, as we had been in *Fertig*. Again, the parties had not presented expert testimony on the scientific reliability of post-hypnotic memory; here, however, the Court remanded the matter to the trial court for a plenary hearing and retained jurisdiction.

## IV.

At the plenary hearing, the State's expert, Dr. David Spiegel, explained that memory is "reconstructive"[9] and thus cannot be "played back" like a videotape. He opined that hypnosis does not significantly affect accuracy, but does tend to increase confidence, with the result that "people who have been hypnotized tend to think that what they [a]re reporting is more accurate, even though the actual rate of accuracy may not have increased much or at all." He further acknowledged identifiable problems with forensic hypnosis, such as confabulation and memory hardening, which can lead to difficulty in cross-examination. Nonetheless, in Dr. Spiegel's view, those problems do not significantly differ from problems related to memory generally. (That point, it should be noted, was a basis for the majority approach in *Hurd, supra,* 86 *N.J.* at 538, 541–43, 432 *A.*2d 86.)

The defense presented two experts, Dr. Steven J. Lynn and Dr. Scott Lilienfeld. Dr. Lynn testified that hypnotically induced testimony is not reliable and that hypnosis, in fact, has an adverse effect on accuracy. He echoed historically expressed concerns about false confidence and confabulation, and indicated that the more hypnotizable people are, the more likely they are to report false memories. In his own research, he found that cross-examination of a hypnotized individual could prove difficult or impossible "if [the] witness confidently believes that a false memory mirrors reality and has problems distinguishing pre- and post-hypnotic

---

[9] Those who view memory as "reconstructive" understand it to be influenced by many factors, including information conveyed by third parties and the individual's knowledge, beliefs, and understanding in respect of a remembered event. Webert, *supra,* 40 *Am.Crim. L.Rev.* at 1304.

memories." Dr. Lynn concluded that the *Hurd* guidelines do not reduce the effects of hypnosis in respect of false confidence, confabulation, uncued errors, recall problems, and response to pseudomemory. He opined that the guidelines

> simply do not obviate problems [such as] the fact that the hypnotized subject enters with expectations that the procedure will be very helpful, expectations that the memories elicited will be accurate, and ... any problems in memory that may be present prior even to the implementation of hypnosis and the *Hurd* guidelines.

Defendant's other expert, Dr. Lilienfeld, also challenged the sufficiency of the *Hurd* guidelines in reducing the risk of false or inaccurate memories. He stated that the guidelines incorrectly "assume that by obtaining a full recording of the interactions between the hypnotist and the subject and [then] comparing systematically the pre-versus [the] post-hypnotic report, [it is possible to determine] whether or not any of the information provided by the hypnotist was leading or misleading." He opined that there should be a per se ban on hypnotically enhanced testimony because such testimony was likely to produce invalid memories. In that regard, he referred to research "suggest[ing] that hypnosis by itself can incur an increased risk of pseudo memories or false memories" and that hypnosis appears "to have an incremental or additional effect above and beyond leading questions" or other confounding influences on memory. Finally, Dr. Lilienfeld rejected the notion that because leading questions and other similar techniques permitted in the courtroom distort ordinary recall, hypnosis should be similarly permitted. He would not "lower the bar even more" simply because there are already problems with certain forms of suggestive influence.

## V.

Based on the expert testimony and scientific research submitted by the parties, the trial court decided that hypnotically refreshed testimony should be per se inadmissible. In so concluding, the court used a cost-benefit analysis, identifying as benefits an increase in recall, an opportunity for the witness to focus and attempt to reconstruct his or her memory, and an opportunity "to

revisit a traumatic event in a relatively non-harmful and non-threatening context." Conversely, the court identified the costs as a potential adverse effect on accuracy, an increased state of suggestibility, the risk of confabulation, and a tendency toward concreting (or the "honest liar" syndrome).[10]

The trial court also noted that "[h]ypnosis is likely to be used where identification is at issue and there [i]s not a lot of other evidence on the identification issue." The court opined that determining the credibility of a witness when the witness believes what he or she is saying is difficult, and that hypnosis "does have a significant adverse effect on the ability of an advocate to effectively cross-examine." The post-*Hurd* writings of Dr. Orne disavowing the efficacy of the *Hurd* guidelines also were important to the court in reaching its conclusion. Even the charge approved after *Fertig* was found by the court to be inadequate because problems such as increased confidence, the aura of scientific objectivity presented by hypnosis, and concreting, are not addressed in the charge.

The costs, the court decided, outweighed the benefits.

## VI.

Many courts considering hypnotically refreshed testimony have asked whether such testimony meets the standard for the admissibility of scientific evidence set forth in *Frye, supra,* 293 *F.* 1013. *See, e.g., Mack, supra,* 292 *N.W.*2d at 767–69; *Shirley, supra,* 181 *Cal.Rptr.* 243, 723 *P.*2d at 1373–74. In 1993, the United States Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L.Ed.*2d 469 (1993), which relaxed the *Frye* requirements. Under *Daubert,*

---

[10] Concreting is a phenomenon in which hypnotized individuals become convinced that their memories are correct because they remembered them in hypnosis. Antonia F. Giuliana, Note, *Between a Rock and a Hurd Place: Protecting the Criminal Defendant's Right to Testify After Her Testimony Has Been Hypnotically Refreshed,* 65 *Fordham L.Rev.* 2151, 2169 (1997).

a trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," 509 *U.S.* at 589, 113 *S.Ct.* at 2795, 125 *L.Ed.*2d at 480, by asking "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue," *id.* at 592–93, 113 *S.Ct.* at 2796, 125 *L.Ed.*2d at 482.[11]

Prior to *Daubert,* New Jersey had adopted a similar standard for the admission of scientific evidence in cases involving environmental torts. *Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 593 *A.*2d 733 (1991). In *Rubanick,* this Court held that a scientific theory may be found reliable "if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." *Id.* at 449, 593 *A.*2d 733; *see Kemp v. State,* 174 *N.J.* 412, 809 *A.*2d 77 (2002) (following *Rubanick* standard in medical malpractice case). In general, to prove the reliability of scientific evidence, we have allowed a proponent of that evidence to offer " '(1) the testimony of knowledgeable experts; (2) authoritative scientific literature; [and] (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony.' " *Rubanick,* 125 *N.J.* at 432, 593 *A.*2d 733 (quoting *Windmere, Inc. v. Int'l Ins. Co.,* 105 *N.J.* 373, 379, 522 *A.*2d 405 (1987)).

In New Jersey, then, hypnotically refreshed testimony must meet the "general acceptance" standard if it is to be admissible in a criminal trial. *State v. Harvey,* 151 *N.J.* 117, 169–70, 699 *A.*2d 596 (1997); *see also State v. Harvey,* 121 *N.J.* 407, 428, 581 *A.*2d

---

[11] *See Fed.R.Evid.* 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

483 (1990) (excluding expert testimony about bloody sneaker print because State "did not provide evidence that anyone in the scientific community other than [the expert] himself vouch[ed] for his methods").

## VII.

Today we hold that in a criminal trial, the hypnotically refreshed testimony of a witness generally is inadmissible in New Jersey. Twenty-five years ago in *Hurd* this Court crafted a solution to the complex of problems raised when a witness testifies after undergoing hypnosis to improve his or her memory. Concerned about the reliability of hypnotically refreshed testimony, the Court established guidelines for conducting hypnotic sessions to ensure that the witness's refreshed memory would be as reliable as ordinary recall. On a defendant's claim that the prosecution violated the guidelines, *Hurd* required an inquiry to determine whether the challenged post-hypnotic testimony could be put before the trier of fact. That approach, in the years since *Hurd*, has been challenged by the experts and rejected by the majority of courts considering the issue. Many of the jurisdictions that have declined to adopt *Hurd* have expressed concern about the inherent unreliability of hypnotically refreshed memory and the efficacy of the guidelines in controlling the adverse impacts of hypnosis. They have also rejected the New Jersey approach because it is time consuming and may lead to inconsistent results in cases that are similar on their facts.

Despite those concerns, we would not abandon the template established in *Hurd* unless we had become convinced that the scientific evidence presented below, and relied on by other courts, counsels another course. The difference between the testimony of the experts at the time *Hurd* was decided, and the experts who testified on remand in this case, is largely a difference in degree, not substance. Yet, that difference is telling. Although the scientific community has not reached a definitive consensus on the issue, more recent studies reaffirm and strengthen earlier under-

standings about how hypnosis affects both memory and attitude. We now conclude on the basis of this data that hypnotically refreshed testimony cannot meet the general acceptance standard of admissibility.

Moreover, there has been a shift in expert opinion suggesting that the problems associated with the use of hypnotically refreshed testimony are less amenable to correction through controls on the hypnotic process. Dr. Orne himself has concluded that the procedural safeguards he advocated in *Hurd* are inadequate to their purpose. We are unable to determine whether hypnotically refreshed testimony is as reliable as ordinary recall (a point important to the *Hurd* Court) or even to implement a process to ensure that such testimony can meet that criterion.

In sum, the experts that testified on remand agreed that hypnosis does not produce more accurate recall, but rather, instills a false confidence in the hypnotized individual thereby producing an aura of truthfulness that subverts effective cross-examination, a cornerstone of the adversarial system. Moreover, the cumulative import of the testimony below, the scientific literature, and the case law from other states is that there is at this point no way to gauge the reliability of hypnotically induced testimony. There is a consensus among scientists and clinical practitioners, including the experts below, that memory is reconstructive and that recall generally is a complicated process in which the individual draws material from many sources. In relation to hypnotically refreshed memory, specifically, because numerous factors "influence how events are perceived, [there are] psychologists and psychiatrists [who] believe hypnosis itself can affect recall." Daniel R. Webert, Note, *Are the Courts in a Trance? Approaches to the Admissibility of Hypnotically Enhanced Witness Testimony in Light of Empirical Evidence,* 40 *Am.Crim. L.Rev.* 1301, 1304 (2003).

Most important here, the testifying experts and the scientific literature are consistent in their description of the effects of hypnosis—suggestibility, confabulation or "gap filling," pseudomemory or "false memory," memory hardening or "false confidence"

in one's recollections, source amnesia, and loss of critical judgment. Antonia F. Giuliana, Note, *Between a Rock and a Hurd Place: Protecting the Criminal Defendant's Right to Testify After Her Testimony Has Been Hypnotically Refreshed*, 65 *Fordham L.Rev.* 2151, 2166–69 (1997); Webert, 40 *Am.Crim. L.Rev.* at 1320–23; *see* Martin T. Orne, et al., *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?, Issues and Practices in Criminal Justice*, Jan. 1985, at 5–27. In contrast, there is a lack of empirical evidence supporting the popular notion that hypnosis improves recall. Webert, 40 *Am. Crim. L.Rev.* at 1318–20; Nancy Mehrkens Steblay and Robert K. Bothwell, *Evidence for Hypnotically Refreshed Testimony: The View from the Laboratory*, 18 *Law & Hum. Behav.* 635, 648 (1994) ("[t]he hypothesized increase in recall accuracy for hypnotized subjects has not been substantiated by research to date."). In this vein, we add only that the general public believes that "hypnosis [is] a powerful tool to recover accurate memories." Webert, 40 *Am.Crim. L.Rev.* at 13–23. Eighty-eight percent of respondents in a 1999 survey agreed at some level that "hypnosis enables people to accurately remember things they could not otherwise remember." *Ibid.* (citing Myles E. Johnson & Coleen Hauk, *Beliefs and Opinions About Hypnosis Held by the General Public: A Systematic Evaluation*, 42 *Am. J. Clinical Hypnosis* 10, 17 (1999)). That confidence in the power of hypnosis to produce accurate recall affects individuals undergoing hypnosis who are convinced—wrongly—that they will remember precisely what happened to them after they are hypnotized, and affects jurors, who are likely to reach a favorable verdict when a witness has been hypnotized. *Id.* at 1324 (citing Barbara L. Coleman et al., *What Makes Recovered–Memory Testimony Compelling to Jurors?*, 25 *Law & Hum. Behav.* 317, 324–25 (2001)).

Finally, as was the trial court, we are most concerned that, after *Hurd* was decided, Dr. Orne repudiated the guidelines he had suggested because he concluded that information obtained through hypnosis is inherently unreliable and creates the risk of a "serious miscarriage of justice" if used in criminal trials. Giuliana, *supra*,

65 *Fordham L.Rev.* at 2154, n. 20 (citing Wayne G. Whitehouse et al., *Hypnotic Hypermnesia: Enhanced Memory Accessibility or Report Bias?*, 97 *J. Abnormal Psychol.* 289, 294 (1988)); *see also id.* at 2170 (quoting Dr. Orne's warning that " 'there is a considerable risk that the inherent unreliability of information confidently provided by a hypnotized witness may actually be detrimental to the truth-seeking process.' "). Other experts, also, have repeated Dr. Orne's conclusion that the probative value of hypnotically refreshed testimony is outweighed by the inherent risks of distorted recollection and false confidence. Steblay and Bothwell, 18 *Law & Hum. Behav.* at 636.

Twenty-six states limit the admissibility of post-hypnotic testimony. The cases from those states represent a persuasive body of law, based on expert opinion, holding that hypnotically refreshed testimony is not generally accepted science. *See, e.g., Shirley, supra,* 181 *Cal.Rptr.* 243, 723 *P.*2d at 1366 ("hypnotically induced testimony is so widely viewed as unreliable that it is inadmissible"); *Burral, supra,* 724 *A.*2d at 80 ("hypnosis as memory enhancer has [not] gained general acceptance in the relevant scientific community"). We now agree with that view. The theory that hypnosis is a reliable means of improving recall is not generally accepted in the scientific community. *See Rubanick, supra,* 125 *N.J.* at 432, 593 *A.*2d 733 (setting forth this standard). Because we are no longer confident that procedural safeguards can guard effectively against the risks associated with hypnotically refreshed testimony, we reject the *Hurd* approach and hold that M.A.'s testimony is inadmissible.

Some further comments in respect of M.A.'s hypnosis are warranted. We observe first that in many respects the guidelines were not followed. For example, the psychologist conducting the hypnotic session testified at trial, that he had a history of engagements by the prosecution, which raises questions about his independence, a guideline issue. Second, he told M.A. that he had hypnotized several rape victims and that she would remember the details of her assault "very clearly." That statement to M.A.—to

remember clearly the face of her assailant was sufficiently sugges-
tive in and of itself to taint her post-hypnotic testimony and was,
in any case another guideline violation. M.A. herself believed that
after hypnosis her memory of the attack would be free from error
and wanted to be hypnotized so that she accurately could identify
her attacker. As a consequence of her belief and the hypnotist's
suggestion, at trial M.A. testified with the utmost confidence in the
truth of her identification of defendant, declaring then that hypno-
sis helped her to see "very clearly."

In some sense that fact pattern is a paradigm for what makes
hypnosis unreliable and for why it should not be admissible. Most
disturbing, M.A.'s pre-hypnotic memories were spare and unlikely
to result in a confident identification of her attacker. There was
virtually no other untainted corroborating evidence pointing to
defendant.[12] Our concern for the victim, and for the horror of her
assault, cannot override defendant's right to a fair trial in which
evidence obtained through an unreliable procedure is excluded.[13]

---

[12] We note the State's concession in its brief that "without post-hypnotic
testimony ..., there would not remain a viable prosecution."

[13] Our dissenting colleague argues that the New Jersey Victims' Rights Amend-
ment (VRA or Amendment), *N.J. Const.* Art. I, ¶ 22, compels the admission of a
crime victim's hypnotically refreshed testimony. We agree with the trial court
that "when a balance of competing interest[s] is struck, the greatest protection
goes to a criminal defendant whose liberty interest is at stake." That protection,
as we pointed out in *State v. Buonadonna*, derives from both the Federal and the
New Jersey Constitutions:

> The right to testify at one's own trial implicates the fourteenth amendment's
> due-process guarantee, the sixth amendment's compulsory-process guaran-
> tee, and is a corollary to the fifth amendment's privilege against self-
> incrimination. The right to testify is also guaranteed by our State Constitu-
> tion, article I, paragraphs 1 and 10, and by *N.J.S.A.* 2A:81–8.
> [122 *N.J.* 22, 36, 583 *A.*2d 747 (1991) (internal citations omitted).]

Although the VRA mentions specific rights that are to be afforded victims, the
Amendment does not suggest that a crime victim has the right to present
hypnotically refreshed testimony. *N.J. Const.* art. I, ¶ 22. We observe that
victims' testimony may be limited for a variety of reasons, including a finding
that an identification has been tainted by the suggestiveness of a pretrial
procedure under *Wade, supra,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L. Ed.*2d 1149, and

■ Under *Rock* a defendant may testify at his own trial after having been hypnotized. *Rock, supra,* 483 *U.S.* at 61, 107 *S.Ct.* at 2714, 97 *L.Ed.*2d at 52. Regardless of our concerns about such testimony, we are constrained to accommodate defendants' rights in that setting. We are therefore, by this opinion, asking the Criminal Practice Committee to consider and recommend improvements to both the *Hurd* guidelines and the *Fertig* charge. There are suggestions in the record below and in the scientific literature that are available to the Committee as it undertakes its task.

## VIII.

The conclusion of the trial court that hypnotically refreshed testimony should be inadmissible is affirmed. The matter is remanded to the Law Division for any further proceedings consonant with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

The majority reaches two separate conclusions: that, "in many respects the guidelines [under *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981) governing the use of hypnotically refreshed testimony] again were not followed[,]" *ante,* 188 *N.J.* at 210, 902 *A.*2d at 1229 (2006); and that, notwithstanding *Hurd* and its progeny, "[t]oday we hold that in a criminal trial, hypnotically refreshed testimony of a witness generally is inadmissible in New Jersey[,]" *ante,* 188 *N.J.* at 207, 902 *A.*2d at 1227 (2006), a rule of exclusion that is inapplicable to a defendant's testimony under *Rock v. Arkansas,* 483 *U.S.* 44, 61, 107 *S.Ct.* 2704, 2714, 97 *L.Ed.*2d 37, 52 (1987).

I concur with the majority's conclusion that, in this case, the procedures followed in respect of the hypnosis of the victim violated the *Hurd* guidelines and, hence, the victim's post-hypnotic

---

a court's determination that the probative value of proffered testimony is substantially outweighed by the risk of undue prejudice, confusion, or misleading the jury under *N.J.R.E.* 403.

statements should be inadmissible. However, to the extent that the majority jettisons all hypnotically refreshed testimony save for that of a defendant, I dissent.

As the majority convincingly explains, the requirement that a defendant must be allowed to present his own hypnotically refreshed testimony is rooted in a defendant's constitutional right to testify on his own behalf. *Ante,* 188 *N.J.* at 200–01, 902 *A.*2d at 1223 (2006). Although the majority hews to the view that a criminal defendant's constitutional rights trump those of all others, *ante,* 188 *N.J.* at 211 n. 13, 902 *A.*2d at 1229 n. 13 (2006), I disagree. In New Jersey there are competing constitutional rights that must be recognized in this context. Our Constitution explicitly provides that "[a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system." *N.J. Const.* art. I, ¶ 22. Implicitly acknowledging that victims as a matter of right will be witnesses at criminal trials, the Constitution further provides that "[a] victim of a crime shall not be denied the right to be present at public judicial proceedings except when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the [Court] Rules...." *Ibid.* It further explains that "[a] victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature." *Ibid.*

The Legislature implemented the mandates of paragraph 22 of Article I of the New Jersey Constitution by its adoption of the Crime Victim's Bill of Rights, *N.J.S.A.* 52:4B–34 to –38. Among other things, that statute specifically provides that a crime victim is "entitled to the ... right ... [t]o be informed about the criminal justice process; ... [t]o have inconveniences associated with participation in the criminal justice process minimized to the fullest extent possible; ... [and t]o be notified if presence in court is not needed[.]" *N.J.S.A.* 52:4B–36b, d, and g. Sustaining these rights is the clear recognition that victims have the right to testify against the person who harmed them, and that such right is of constitutional dimension in New Jersey.[1]

---

[1] Tellingly, neither the Sixth Amendment to the U.S. Constitution nor paragraph 10 of Article I of the New Jersey Constitution explicitly grants a defendant

In my view, a defendant's constitutional right to testify on his own behalf and a victim's constitutional right to testify against the one who stands accused of harming that victim cannot be of unequal constitutional dignity. If, then, the Constitution allows the barring of hypnotically refreshed testimony but requires that an exception be made for a defendant's hypnotically refreshed testimony, there is no principled basis on which to treat a victim's hypnotically refreshed testimony any differently than that of the defendant. In other words, if we abandon the principles of *Hurd* and conclude that, in general, hypnotically refreshed testimony is forbidden in New Jersey because of its demonstrated unreliability, then the same logic that compels an exception for a defendant's hypnotically refreshed testimony likewise compels an exception for a victim's hypnotically refreshed testimony.

Therefore, to the extent the majority only admits of an exception for a defendant's hypnotically refreshed testimony, and does not allow a similar exception in respect of a victim's hypnotically refreshed testimony, I respectfully dissent.

*For affirmance and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.

---

the constitutional right to testify on his own behalf. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. In fact, it is the opposite conclusion that obtains: a defendant in a criminal case cannot be compelled to testify against himself. *Compare U.S. Const.* amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself[,]") *with State v. Deatore,* 70 *N.J.* 100, 113, 358 *A.2d* 163 (1976) ("The right not to be compelled to incriminate one's self arises in New Jersey, not from the State Constitution (as it does in most other states) but as part of the common law, confirmed by statute. . . .").